KAREN LeCRAFT HENDERSON, Circuit Judge,
dissenting:
In 1952, the Honorable Robert H. Jackson' — -Associate Justice of the United States Supreme Court and former chief prosecutor at Nuremberg — set out what has become the “accepted framework” for our constitutional jurisprudence in the areas of national security and military affairs. Medellín v. Texas, 552 U.S. 491, 524, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008). Justice Jackson famously identified three categories of governmental action. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635-38, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). When the President and the Congress disagree (Category 3), their powers are subtractive. Id. at 637-38, 72 S.Ct. 863. When the President and the Congress act in concert (Category 1), however, their powers are additive: “the United States is invested with all the attributes of sovereignty” and the courts “should hesitate long before limiting or embarrassing such powers.” Id. at 635-37 & n. 2, 72 S.Ct. 863 (quoting Mackenzie v. Hare, 239 U.S. 299, 311, 36 S.Ct. 106, 60 L.Ed. 297 (1915)) (emphasis omitted).
*28 Yet, according to my colleagues, Justice Jackson didn’t get the math quite right. He apparently failed to factor in an additional constraint on the political branches’ combined war powers: international law. My colleagues contend — as a matter of constitutional law, not simple comity— that the Congress cannot authorize military-commission trials unless the international community agrees, jot and tittle, that the offense in question violates the law of war. And the content of international law is to be determined by — -who else? — the Judiciary, with little or no deference to the political branches. Contra Rostker v. Goldberg, 453 U.S. 57, 65-66, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (“perhaps in no other area has the Court accorded Congress greater deference” than “in the context of Congress’ authority over national defense and military affairs”). But the definition and applicability of international law is, in large part, a political determination, see Finzer v. Barry, 798 F.2d 1450, 1459-60 (D.C.Cir.1986), aff'd in part, rev’d in part sub nom. Boos v. Barry, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), and the decision to try an alien enemy combatant by military commission is- part and parcel of waging war, see Application of Yamashita, 327 U.S. 1, 11-12, 66 S.Ct. 340, 90 L.Ed. 499 (1946). The majority opinion thereby draws us into a thicket, one in which our “lack of competence ... is marked,” Rostker, 453 U.S. at 65, 101 S.Ct. 2646, our democratic unaccountability glaring, Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), and the ramifications of our actions unpredictable, Holder v. Humanitarian Law Project, 561 U.S. 1, 34, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (“most federal judges” do not “begin the day with briefings that may describe new and serious threats to our Nation and its people”).
The immediate consequences of today’s decision are serious enough: my colleagues bar the Government from employing military commissions to try individuals who conspire to commit war crimes against the United States. But the consequences moving forward may prove more alarming still. My colleagues’ opinion means that, in future conflicts, the Government cannot use military commissions to try enemy combatants for any law-of-war offense the international community has not element-by-element condoned. Their timing could not be worse. See Letter from the President to the Congress of the United States — Authorization for the Use of United States Armed Forces in Connection with the Islamic State of Iraq and the Levant (Feb. 11, 2015). And the beneficiary of today’s decision could not be less deserving. Ali Hamza Ahmad Suliman al Bahlul (Bahlul) “is an alien unlawful enemy combatant who — like Hitler’s Goebbels- — -led Osama bin Laden’s propaganda operation.” Bahlul v. United States, 767 F.3d 1, 33-34 (D.C.Cir.2014) (en banc). (Henderson, J., concurring). He “freely admitted” — indeed, bragged about — his role in the attacks of September 11, 2001. Id. at 34. During his military-commission trial, he never raised any of the arguments we today consider. The 'en banc court deemed his Ex Post Facto challenge forfeited and reviewed it for plain error only. Id. at 9-11. We should have taken the same approach here, rather than declaring unconstitutional a provision of the Military Commissions Act of 2006 (2006 MCA), Pub.L. No. 109-366,120 Stat. 2600.
Accordingly, I must dissent.
I. Standard of Review. .29
II. The Constitutional Challenges 42
A. Article I. 43
*29 44 1. Define and Punish Clause.
52 2. Necessary and Proper Clause ...
55 3. Broader War Powers.
56 a. Supreme Court Precedent ..
58 b. Winthrop’s Treatise.
59 c. Historical Practice.
B. Article III..
1. Judicial Power Clause. 63
2. Criminal Jury Clause . 69
C. Equal Protection & First Amendment. 72
I. STANDARD OF REVIEW
Beyond its troubling ramifications, one of the real tragedies of today’s decision is just how unnecessary it is. Rather than reaching the merits, this case should begin and end with the “measuring stick” of appellate decisionmaking: the standard of review. John C. Godbold, Tiventy Pages and Twenty Minutes: Effective Advocacy ■on Appeal, 30 Sw. L.J. 801, 810 (1976). The measuring stick we should use to review Bahlul’s arguments is plain error.
Bahlul is an “alien unlawful enemy combatant” (enemy combatant) subject to trial by military commission under the 2006 MCA. 10 U.S.C. § 948c (2006). He contends that his conviction of conspiracy to commit war crimes, 10 U.S.C. § 950v(28) (2006) (the challenged provision), violates the Define and Punish' Clause of Article I, the Judicial Power and Criminal Jury Clauses of Article III, the equal protection component of the Fifth Amendment Due Process Clause and the First Amendment. Had Bahlul properly preserved these questions of law, we would review them de novo. See United States v. Popa, 187 F.3d 672, 674 (D.C.Cir.1999). But he failed to do so.
During the military-commission proceedings, as the en banc court determined, Bahlul “waived all pretrial motions, asked no questions during voir dire, made no objections to prosecution evidence, presented no defense and declined to make opening and closing arguments.” Bahlul, 767 F.3d at 7. He “flatly refused to participate” and “instructed his trial counsel not to present a substantive defense.” Id. at 10. When Bahlul did make objections, they were “couched entirely in political and religious terms.” Id. He began by accusing the United States of being “an enemy [of] the Nation of Muslims” that supports “the great injustice that is carried out by ... the Jews on the Muslims in Palestine.” Appendix (App.) 112. He concluded by disclaiming concern with the proceedings because they were based on earthly law, not Allah’s dictates. App. 116. Although he made Stray references to “discrimination” and the “illegal” nature of his trial, App. 114-15, his remarks were “unquestionably ‘too general to have alerted the trial court to the substance of his point.’ ” Bahlul, 767 F.3d at 10 (quoting, inter alia, United States v. Bolla, 346 F.3d 1148, 1152 (D.C.Cir.2003) (alteration omitted)). Bahlul therefore forfeited every substantive challenge to his conviction. See Puckett v. United States, 556 U.S. 129, 134, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009).
In other words, Bahlul violated the contemporaneous-objection rule. That rule requires a party to, in a phrase, “speak now or forever hold your peace”: if he fails to raise an,argument in the trial court, he cannot raise it later on appeal. See id. at 135, 129 S.Ct. 1423; Miller v. Avirom, 384 F.2d 319, 321-22 (D.C.Cir.1967). The contemporaneous-objection rule serves at least two purposes. First, it encourages fairness by penalizing sandbagging — i.e., *30 “the intentional withholding of an objection by a party to be raised on appeal only if he loses at trial.” Bahlul, 767 F.3d at 9 (citing, inter alia, Wainwright v. Sykes, 433 U.S. 72, 89, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). Second, the rule promotes judicial efficiency by giving the trial court the first opportunity to correct errors, Puckett, 556 U.S. at 134, 129 S.Ct. 1423, and by ensuring that “litigation remains, to the extent possible, an orderly ... winnowing process,” Exxon Shipping Co. v. Baker, 554 U.S. 471, 487 n. 6, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) (quotation marks omitted). See also Waimvright, 433 U.S. at 90, 97 S.Ct. 2497 (contemporaneous-objection rule makes trial “main event” rather than mere “tryout on the road”).
The rule operates differently in civil and criminal cases. See Salazar ex rel. Salazar v. Dist. of Columbia, 602 F.3d 431, 437 (D.C.Cir.2010). In civil cases, forfeiture is usually the end of the matter; the appellate court does not review the tardy argument at all, unless it excuses the forfeiture due to “exceptional circumstances.” Dist. of Columbia v. Air Fla., Inc., 750 F.2d 1077, 1085 (D.C.Cir.1984). In criminal cases — including these unique enemy combatant cases — forfeiture triggers plain-err ror review. Bahlul, 767 F.3d at 9 (citing, inter alia, Fed.R.CRIm.P. 52(b); 10 U.S.C. § 950a(a)). The appellate court automatically excuses the defendant’s forfeiture but reviews his argument under a more •exacting standard. See United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (“[t]he appellate court must consider the error” but it “may correct the error ... only if’ it is plain (first emphasis added)). In this way, the plain-error standard “tempers the blow” of the contemporaneous-objection rule for a criminal defendant. United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). But it also “reflects a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed.” United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).
The plain-error standard applies to “all” forfeited arguments in a criminal case. Puckett, 556 U.S. at 136, 129 S.Ct. 1423; accord United States v. Delgado, 672 F.3d 320, 331 (5th Cir.2012) (“[W]e do not read [the Supreme Court’s cases] as allowing for any exceptions to the application of the plain-error test for forfeited claims.”).[1] There is only one type of argument that is nonforfeitable and therefore exempt from plain-error review: subject-matter jurisdiction. See United States v. Cotton, 535 U.S. 625, 631, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002); United States v. David, 96 F.3d 1477, 1482 (D.C.Cir.1996); accord United States v. Washington, 653 F.3d 1251, 1257-58 (10th Cir.2011) (“if a court ordinarily would consider an argument ... to be forfeited, it should only refrain from doing so ... when the alleged error is jurisdictional”).[2] Subject-matter jurisdic *31 tion “can never be forfeited” because “it involves a court’s power to hear a case.” Cotton, 535 U.S. at 630, 122 S.Ct. 1781 (emphasis added); see also United States v. Baucum, 80 F.3d 539, 540 (D.C.Cir.19 96).
Bahlul cannot seriously contest the military commission’s jurisdiction. The 2006 MCA authorizes trial by military commission of “any offense made punishable by this chapter,” including “conspiracy.” 10 U.S.C. §§ 948d(a), 950v(b)(28) (2006). It “explicitly confers jurisdiction on military commissions to try [Bahlul on] the charged offenses.” Bahlul, 767 F.3d at 10 n. 6. Granted, Bahlul challenges this jurisdictional grant as beyond the Congress’s authority under the Define and Punish Clause. A challenge to the constitutionality of a jurisdictional statute, however, is not itself jurisdictional. See United States v. Williams, 341 U.S. 58, 66, 71 S.Ct. 595, 95 L.Ed. 747 (1951) (“Even the unconstitutionality of the statute under which the proceeding is brought does not oust a court of jurisdiction.”); United States v. Drew, 200 F.3d 871, 876 (D.C.Cir.2000) (noting “the error in labeling a challenge to the constitutionality of a statute a jurisdictional issue”); Cotton, 535 U.S. at 630, 122 S.Ct. 1781 (same); Baucum, 80 F.3d at 540-41 (because every federal statute enjoys “a presumption of validity,” the “assertion of a constitutional defect does not work to divest th[e] court of its original jurisdiction”). Bahlul’s Article I Define and Punish Clause argument is no more jurisdictional than his Article I Ex Post Facto Clause argument, which the en banc court reviewed for plain error. See Bah-lul, 767 F.3d at 10 n. 6 (“The question whether [the 2006 MCA] is unconstitutional does not involve the court[’s] statutory or constitutional power to adjudicate the case.” (quotation marks omitted)); see also, e.g., United States v. Nueci-Peña, 711 F.3d 191, 197 (1st Cir.2013) (reviewing Define and Punish Clause challenge for plain error); United States v. Urena, 140 Fed.Appx. 879, 881 (11th Cir.2005) (same).
Bahlul’s challenge under the Judicial Power Clause of Article III is also forfeita-ble. Like his Define and Punish Clause argument, his Judicial Power Clause challenge is to the constitutionality of a jurisdictional statute, a challenge that is itself, to repeat, plainly nonjurisdictional. See Williams, 341 U.S. at 66, 71 S.Ct. 595; Bahlul, 767 F.3d at 10 n. 6; Baucum, 80 F.3d at 540-41. The “Article III” label changes nothing; by this Clause, Article III restricts the Congress’s power, not the power of the courts or military commissions. See CFTC v. Schor, 478 U.S. 833, 850, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (“Article III, § 1 ... bar[s] congressional attempts to transfer jurisdiction to non-Article III tribunals” (emphasis added) (quotation marks and alterations omitted)). *32 If a Judicial Power Clause challenge were in fact jurisdictional, a court would be required to raise it sua sponte each time it reviews a decision of a non-Article III tribunal {e.g., agency adjudicator, magistrate judge, bankruptcy court). See Baucum, 80 F.3d at 541. Courts, of course, do not do this because they “would have to assure themselves of a statute’s validity as a threshold matter,” “runfning] afoul of established Supreme Court precedent declining to address constitutional questions not put in issue by the parties.” Id.; see also, e.g., Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 64 n. 19, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (declining to reach Article III issue because “however helpful it might be for us to. adjudge every ... constitutional issue presented by [a statute], we cannot properly reach out and decide matters not before us”); United States v. Spector, 343 U.S. 169, 172, 72 S.Ct. 591, 96 L.Ed. 863 (1952) (declining to consider sua sponte Article III Judicial Power Clause issue); Benjamin v. Jacobson, 172 F.3d 144, 163 n. ** (2d Cir.1999) (en banc) (same); In re Constr. Equip. Co., 665 F.3d 1254, 1256 n. 3 (Fed.Cir.2011) (same).
Why, then, do my colleagues review Bahlul’s Article III challenge de novo? As best I can tell, their answer is “because Schor says so.” See Maj. Op. 3-7; Concur. Op. 23-24. I respectfully disagree. Here is the relevant passage from Schor:
[0]ur precedents establish that Article III, § 1, not only preserves to litigants their interest in an impartial -and independent federal adjudication of claims within the judicial power of the United States, but also serves as an inseparable element of the constitutional system of checks and balances. Article HI, § 1 safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts to transfer jurisdiction to non-Article III tribunals for the purpose of emasculating constitutional courts, and thereby preventing the encroachment or aggrandizement of one branch at the expense of the other. To the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2. When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect.
478 U.S. at 850-51, 106 S.Ct. 3245 (emphases added) (quotation marks, citations and alterations omitted). But the High Court did not, by this language, instruct courts to treat Judicial Power Clause challenges as nonforfeitable or to automatically review them de novo.[3]
*33 Put simply, Schor is not a case about forfeitability at all. As already discussed, the only nonforfeitable argument is subject-matter jurisdiction. See Cotton, 535 U.S. at 631, 122 S.Ct. 1781; David, 96 F.3d at 1482; accord Freytag v. Comm’r, 501 U.S. 868, 893-94, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring) (“A party forfeits the right to advance on appeal a nonjurisdictional claim, structural or otherwise, that he fails to raise at trial.” (emphasis added)). Schor did not hold that a Judicial Power Clause challenge is “jurisdictional.” Granted, the Court said that “parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction.” Schor, 478 U.S. at 851, 106 S.Ct. 3245 (emphasis added). In a later case, four Justices speculated that Schor drew an “analogy” between the Judicial Power Clause and subject-matter jurisdiction. Freytag, 501 U.S. at 897, 111 S.Ct. 2631 (Scalia, J., concurring). But an issue’s analogy to subject-matter jurisdiction does not make it jurisdictional; in fact, the very need for analogy suggests that the concepts are different. See William Fleming, Vocabulary of Philosophy, in A Vocabulaey of the Philosophical SCIENCES 21 (1878) (“Analogy implies a difference in sort, and not merely in degree .... ”); see also NFIB v. Sebelius, — U.S. -, 132 S.Ct. 2566, 2656 n. 6, 183 L.Ed.2d 450 (2012) (Scalia, Kennedy, Thomas, Alito, JJ., dissenting) (“That the penalty is to be ‘assessed and collected in the same manner as taxes’ refutes the proposition that it is a tax.... ” (emphases in original)). And the analogy is a poor one at that. Because there is nothing jurisdictional about a challenge to the Congress’s constitutional authority to enact a statute, see Williams, 341 U.S. at 66, 71 S.Ct. 595; Bahlul, 767 F.3d at 10 n. 6; Baucum, 80 F.3d at 540-41, a one-sentence analogy is far too slim a reed to conclude that Schor carved out a “judicial power” exception to the Court’s earlier— and consistent — precedent on the forfeita-bility of constitutional arguments. See, e.g., Williams, 341 U.S. at 66, 71 S.Ct. 595; Yakus, 321 U.S. at 444, 64 S.Ct. 660. See generally Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 18, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) (“This Court does not normally overturn, or so dramatically limit, earlier authority sub silentio.”).
But don’t take my word for it. The Supreme Court has since clarified that Schor did not declare Judicial Power Clause challenges to be nonforfeitable; instead, the Court in Schor at most exercised its discretion to excuse the forfeiture. In Plaut v. Spendthrift Farm, Inc., the Government — like Bahlul — attempted to rely on Schor for the proposition that “parties cannot waive the structural principle of Article III.” Brief for United States at 27, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (No. 931121), 1994 WL 387806. The Supreme Court expressly rejected this view:
[T]he proposition that legal defenses based upon doctrines central to the courts’ structural independence can never be waived simply does not accord *34 with our cases. Certainly one such doctrine consists of the “judicial Power” to disregard an unconstitutional statute; yet none would suggest that a litigant may never waive the defense that a statute is unconstitutional.... We held in Schor that, although a litigant had consented to bring a state-law counterclaim before an Article I tribunal, we would nonetheless choose to consider his Article III challenge, because “when these Article III limitations are at issue, notions of consent and waiver cannot be dispositive,” id., at 851, 106 S.Ct. 3245 (emphasis added). See also Freytag v. Commissioner, 501 U.S. 868, 878-879, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (finding a “rare cas[e] in which we should exercise our discretion” to hear a waived claim based on the Appointments Clause, Art. II, § 2, cl. 2).
Plant, 514 U.S. at 231-32, 115 S.Ct. 1447 (first emphasis added) (some citations omitted). Plant makes plain that a party can forfeit a Judicial Power Clause argument and there is no “Schor exception” to the rule that a “structural” constitutional challenge is forfeitable. Whether an appellate court entertains such a challenge is a matter of discretion, not an inexorable command from Schor.[4]
Granted, in a series of bankruptcy cases, many of our sister circuits interpreted Schor to create a rule of nonforfeitability, despite the Supreme Court’s clarification in Plant. See Wellness Int’l Network, Ltd v. Sharif, 727 F.3d 751, 767-73 (7th Cir.2013), rev’d, — U.S. -, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015); In re BP RE, L.P., 735 F.3d 279, 286-87 (5th Cir.2013); Waldman v. Stone, 698 F.3d 910, 917-18 (6th Cir.2012). But see In re Bellingham Ins. Agency, Inc., 702 F.3d 553, 566 (9th Cir.2012), aff'd on other grounds sub nom. Exec. Benefits Ins. Agency v. Arkison, — U.S. -, 134 S.Ct. 2165, 189 L.Ed.2d 83 (2014). In Kuretski v. Commissioner, this Court — relying in part on the bankruptcy cases from our sister circuits — read Schor to mean that a party “did not (and could not) ... waive his ‘structural’ claim” under the Judicial Power Clause of Article III. 755 F.3d 929, 937 (D.C.Cir.2014) (emphasis added); see also id. at 938 (citing Waldman). No matter the correctness vel non of these cases when they were decided, their continued validity has been fatally undermined by two very recent Supreme Court decisions.
In B & B Hardware, Inc. v. Hargis Indus., Inc., — U.S. -, 135 S.Ct. 1293, 191 L.Ed.2d 222 (2015), the Supreme Court considered whether the decisions of the Trademark Trial and Appeal Board — a non-Article III tribunal — were entitled to issue-preclusive effect. See id. at 1299, 1303. If issue preclusion applied, the respondent claimed that the Judicial Power Clause would be violated. See id. at 1304. The Court expressly declined to consider the claim because the respondent had not briefed it. See id.; see also id. at 1305 n. 2 (“[W]e do not decide whether such preclusion is unconstitutional because the issue is not before us.”); id. at 1304 (“To the ex *35 tent ... there could be a meritorious constitutional objection, it is not before us.”). In other words, the respondent forfeited the Article III argument — a holding that plainly contradicts the notion that Judicial Power Clause challenges are nonforfeitable. Significantly, the Court relied on Plant to support its forfeiture determination. See id. at 1304 (citing Plaut, 514 U.S. at 231-32, 115 S.Ct. 1447).
In Wellness International Network, Ltd. v. Sharif, — U.S. -, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015), the Supreme Court made its view on the forfeitability of a Judicial Power Clause challenge as plain as day. The main holding of Sharif is that a party’s consent eliminates the Article III problem presented by bankruptcy court adjudication. See 135 S.Ct. at 1938-39. But, near the end of the opinion, the Court also indicated that Judicial Power Clause challenges are forfeitable. In the decision under review, the Seventh Circuit had held that the “structural interests” protected by the Judicial Power Clause cannot be forfeited. See id. at 1941 & n. 5 (quoting Sharif, 727 F.3d at 771). The Supreme Court reversed that decision in toto. See id. at 1942, 1948-49. In fact, the Court remanded the case to the Seventh Circuit with instructions to conduct the “factbound analysis” necessary to determine “whether ... Sharif forfeited his Stem argument below.” Id. at 1949. [A “Stem argument” — it should go without saying, contra Maj. Op. 5-6 — is a “structural” Judicial Power Clause challenge. See Arkison, 134 S.Ct. at 2170 (“Stem claims” are “claim[s] designated for final adjudication in the bankruptcy court ... but prohibited from proceeding in that way as a constitutional matter” because “Article III prohibits Congress from vesting a bankruptcy court with th[at] authority” (emphasis added)).] One Justice in Sharif went further, concluding that remand was unnecessary because the Judicial Power Clause challenge was indisputably forfeited:
[Respondent forfeited any Stem objection by failing to present that argument properly in the courts below. Stem vindicates Article III, but that does not mean that Stem arguments are exempt from ordinary principles of appellate procedure.
Id., concurring op. at 1949 (Alito, J.). He, unsurprisingly, relied on B & B Hardware for this conclusion. Id. (citing B & B Hardware, 135 S.Ct. at 1304). The other five Justices in the Sharif majority necessarily agreed that “ordinary principles of appellate procedure” govern, id.: they would not have remanded the forfeiture question if the Seventh Circuit were right all along that a “structural” Judicial Power Clause challenge cannot be forfeited.[5] Ac *36 cordingly, Sharif not only overruled our sister circuits’ earlier bankruptcy cases, but, in my reading, it also undermined the relevant language from Kuretski. Contra Maj. Op. 4.
Notwithstanding the charge that I “misinterpret[]” Sharif, Maj. Op. 6, it is my colleagues’ reading that misses the mark. They believe Sharif reinforced Schor’s supposed rule of nonforfeitability. To support this point, they rely on passages in Sharif that discuss the distinction between the “personal” and “structural” aspects of Article III. See Maj. Op. 4, 5, 6 (citing Sharif, 135 S.Ct. at 1942-43, 1943-44, 1945 n. 10; id., dissenting op. at 1956 (Roberts, C.J.)). These passages, however, have nothing to do with appellate procedure; they instead speak to the merits.
To put it another way, when Sharif speaks of “waiver,” it means the waiver of rights, not the forfeiture of arguments. The question the Court addressed in Sharif is whether “consent” (sometimes referred to, interchangeably, as “waiver”) can “cure the constitutional difficulty ” presented by non-Article III adjudication. 135 S.Ct. at 1943, 1945 n. 10 (quoting Schor, 478 U.S. at 851, 106 S.Ct. 3245 (emphasis added)); id., dissenting op. at 1956 (Roberts, C.J.) (same). The idea is that, when a party knowingly and voluntarily waives certain constitutional rights, no constitutional violation occurs in the first place. See id., 135 S.Ct. at 1945 n. 10; see also id., dissenting op. at 1961 (Thomas, J.) (“Although it may not authorize a constitutional violation, consent may prevent one from occurring in the first place.”). This is true for “personal” rights, like the right to a jury, but — as Schor and Sharif make plain — it is not true for violations of the Article III Judicial Power Clause. See id., 135 S.Ct. at 1942-43; Schor, 478 U.S. at 849-51, 106 S.Ct. 3245. A party’s consent cannot, by itself, “excuse an actual violation of Article III” because the Judicial Power Clause protects “structural” interests aliunde the narrow concerns of the parties. Sharif, 135 S.Ct. at 1945 n. 10; see also Schor, 478 U.S. at 851, 106 S.Ct. 3245 (“When these Article III limitations are at issue, notions of consent and waiver cannot be disposi-tive because the limitations serve institutional interests that the parties cannot be expected to protect.” (emphasis added)). Sharif, however, clarified that consent can be one factor that keeps a violation of Article III from occurring, so long as it is not the only factor. See 135 S.Ct. at 1945 n. 10 (“[Cjonsent remains highly relevant when determining ... whether a particular adjudication in fact raises constitutional concerns.... [Cjonsent shows, in part, why no [structural] violation has occurred.” (citation omitted)). This is an important holding: it clarifies the role of consent in the application of the Schor balancing test. Yet it says nothing about forfeiture, appellate procedure, preservation of arguments, standards of review or the like. It pertains only to the merits,. i.e. the question whether Article III is in fact violated.[6]
*37 The Supreme Court eloquently explained the waiver-of-rights/forfeiture-of-arguments distinction in Puckett:
[The defendant’s] argument confuses the concepts of waiver and forfeiture. Nobody contends that [the defendant’s] counsel has waived — that is, intentionally relinquished or abandoned — [the defendant’s] right.... The objection is rather that [the defendant] forfeited the claim of error through his counsel’s failure to raise the argument in the District Court. This Court’s precedents requiring that certain waivers be personal, knowing, and voluntary are thus simply irrelevant. Those holdings determine whether error occurred, but say nothing about the proper standard of review when the claim of error is not preserved.
556 U.S. at 138 (citation omitted) (second emphasis added). The Court’s analysis makes plain an obvious point when applied here. An enemy combatant must knowingly and voluntarily consent to non-Article III adjudication before his consent can ward off a violation of the Judicial Power Clause. See Sharif, 135 S.Ct. at 1947-48. But we should not even review a Judicial Power Clause challenge if he forfeits the argument by failing to timely raise it.
To summarize, the Supreme Court has made triply clear in Plaut, B & B Hardware and Sharif that Schor did not label an Article III challenge as nonforfeitable; instead, the Schor Court exercised its discretion to excuse a forfeiture of the Judicial Power Clause challenge. This distinction — between nonforfeitability, on the one hand, and discretion to excuse forfeiture, on the other — is crucial for two reasons.
First, in a criminal case like this one, an appellate court lacks the kind of discretion the Court exercised in Schor. As noted, appellate courts in civil cases can excuse a forfeiture in “éxceptional circumstances.” Air Fla., 750 F.2d at 1085. The Supreme Court has expressly declined to limit this discretion. See Exxon Shipping, 554 U.S. at 487, 128 S.Ct. 2605. Accordingly, courts occasionally exercise their discretion in civil cases to review “structural” separation-of-powers challenges de novo, notwithstanding they were not raised below. See, e.g., Freytag, 501 U.S. at 879, 111 S.Ct. 2631; Schor, 478 U.S. at 851, 106 S.Ct. 3245; Glidden, 370 U.S. at 536-37, 82 S.Ct. 1459 (plurality); Kuretski, 755 F.3d at 936-37. But see Freytag, 501 U.S. at 892-901, 111 S.Ct. 2631 (Scalia, J., concurring) (explaining why “structural” constitutional challenges should not receive special treatment).
The rules are different, however, in criminal cases. Over the last three decades, the Supreme Court has repeatedly restricted our authority to deviate from the plain-error standard. See, e.g., United States v. Marcus, 560 U.S. 258, 262-66, 130 S.Ct. 2159, 176 L.Ed.2d 1012 (2010); Puckett, 556 U.S. at 134-43, 129 S.Ct. 1423; Cotton, 535 U.S. at 629-34, 122 S.Ct. 1781; Johnson, 520 U.S. at 466-70, 117 S.Ct. 1544; Olano, 507 U.S. at 731-41, 113 S.Ct. 1770; Young, 470 U.S. at 14-16 & nn. 12, 14, 105 S.Ct. 1038; Frady, 456 U.S. at 163 & nn. 13-14, 102 S.Ct. 1584. In criminal cases, the plain-error standard operates as a “limitation on appellate-court authority.” Puckett, 556 U.S. at 134, 129 S.Ct. 1423; see also United States v. Farrell, 672 F.3d 27, 36 (1st Cir.2012). It “strictly circum-seribe[s]” our ability to remedy forfeited *38 errors, Puckett, 556 U.S. at 134, 129 S.Ct. 1423; we “must” review them for plain error only. Marcus, 560 U.S. at 266, 130 S.Ct. 2159; United States v. Brown, 508 F.3d 1066, 1076 (D.C.Cir.2007). The plain-error standard strikes a “careful balance” between furthering the purposes of the contemporaneous-objection rule and remedying obvious injustice. Puckett, 556 U.S. at 135, 129 S.Ct. 1423; see also Johnson, 520 U.S. at 466, 117 S.Ct. 1544; Young, 470 U.S. at 15, 105 S.Ct. 1038. “Any unwarranted extension” of the standard “skew[s]” this balance, Young, 470 U.S. at 15, 105 S.Ct. 1038, and “the creation of an unjustified exception” — like the one Bahlul requests — is “even less appropriate.” Puckett, 556 U.S. at 136, 129 S.Ct. 1423 (alteration omitted); see also Young, 470 U.S. at 16 n. 14, 105 S.Ct. 1038 (criticizing practice of creating “per se ” exceptions to plain-error review).
Courts apply plain-error review in criminal cases notwithstanding “the seriousness of the error claimed.” Johnson, 520 U.S. at 466, 117 S.Ct. 1544; accord United States v. Padilla, 415 F.3d 211, 220 (1st Cir.2005) (en banc) (“forfeited errors, even if structural, are subject to [plain-error review]”). Notably, when the Supreme Court was presented with a “structural” Article III challenge in a criminal case, four Justices thought it should be reviewed for plain error — Schor notwithstanding. See Nguyen, 539 U.S. at 88, 123 S.Ct. 2130 (Rehnquist, C.J., dissenting).[7] Likewise, our sister circuits frequently review Judicial Power Clause challenges in criminal cases for plain error only. See, e.g., United States v. Shultz, 733 F.3d 616, 621 (6th Cir.2013); United States v. Woodard, 387 F.3d 1329, 1331, 1333 (11th Cir.2004); United States v. Bishop, 603 F.3d 279, 280 (5th Cir.2010); United States v. Tejeda, 476 F.3d 471, 474 (7th Cir.2007); United States v. Torres, 258 F.3d 791, 794 (8th Cir.2001); United States v. Mike, 632 F.3d 686, 691-92, 700 (10th Cir.2011); United States v. Nash, 438 F.3d 1302, 1304 (11th Cir.2006); United States v. Daniels, 182 F.3d 910 (4th Cir.1999) (table).
The distinction between criminal and civil cases may seem counterintuitive because, ordinarily, the plain-error standard places a criminal defendant in a better position than a civil litigant. See Bahlul, 767 F.3d at 9 (plain-error review “mitigate[s] the sometimes harsh results of the forfeiture rule in criminal cases”). But this intuition focuses myopically on one side of the plain-error “balance” to the exclusion of the other. Puckett, 556 U.S. at 135, 129 S.Ct. 1423. Plain-error review gives the contemporaneous-objection rule its “necessary bite.” Daniel J. Meltzer, State Court Forfeitures of Federal Rights, 99 HaRV. L.Rev. 1128, 1135 (1986); see also id. (“A requirement that a particular issue be raised in a particular fashion or at a particular time would hardly be effective if failures to comply were never punished.”). As the Supreme Court has cautioned, “a reflexive inclination by appellate courts to reverse because of unpreserved error would be fatal” to the rationale of the contemporaneous-objection rule. Puckett, 556 U.S. at 134, 129 S.Ct. 1423 (emphasis added). That rationale is “especially compelling” in criminal cases. Cobbledick v. United States, 309 U.S. 323, 325, 60 S.Ct. 540, 84 L.Ed. 783 (1940); see also Di Bella v. United States, 369 U.S. 121, 124, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962) (“undue litigiousness and leaden-footed administration of justice [are] particularly damaging to the conduct of criminal cases”). Society has an especially strong interest in the finality of criminal proceedings because “[without [it], the criminal law is deprived *39 of much of its deterrent effect.” Teague v. Lane, 489 U.S. 288, 809, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); see also id. (“No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing that a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation.”); Young, 470 U.S. at 16, 105 S.Ct. 1038 (“To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.”). In short, plain-error review reconciles multiple competing concerns in criminal cases and provides a rule to accommodate them ex ante. Absent jurisdictional error, we cannot do otherwise than apply this venerable standard.[8]
Second, even if we could bypass the plain-error standard and review Bahlul’s *40 Article III challenge de novo, I would follow the en banc court and decline to do so here. Preliminarily, my colleagues are wrong to suggest that the Supreme Court has “instructed that courts should excuse waivers of Article III structural claims.” Maj. Op. 6 (emphasis added). Quite the contrary: it is a “rare” case in which we entertain a forfeited Article III argument. Plaut, 514 U.S. at 232, 115 S.Ct. 1447 (quoting Freytag, 501 U.S. at 878-79, 111 S.Ct. 2631). Enforcing the traditional rules of waiver and forfeiture in the context of a Judicial Power Clause challenge, as in other contexts, serves the important interests of “increasing judicial efficiency and checking gamesmanship.” Sharif, 135 S.Ct. at 1948. Moreover, several factors unique to Bahlul’s ease make it a particularly inappropriate occasion to forgive his forfeiture.
Most notably,'my colleagues’ application of de novo review leads them to invalidate a provision of the 2006 MCA — a duly enacted statute produced by a coequal branch. See Rostker, 453 U.S. at 64, 101 S.Ct. 2646 (“[W]e must have due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government.” (quotation marks omitted)). Examining the constitutionality of a statute is “legitimate only in the last resort, and as a necessity.” Chicago & G.T. Ry. Co. v. Wellman, 143 U.S. 339, 345, 12 S.Ct. 400, 36 L.Ed. 176 (1892); see also Pearson v. Callahan, 555 U.S. 223, 241, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (courts should not “pass on questions of constitutionality unless such adjudication is unavoidable” (ellipsis omitted)); Lyng v. Nw. Indian Cemetery Protective Ass’n, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (“A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.”); N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 90, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (Rehnquist, J., concurring in judgment) (“Particularly in an area of constitutional law such as that of ‘Art. Ill Courts,’ with its frequently arcane distinctions and confusing precedents, rigorous adherence to the principle that this Court should decide no more of a constitutional question than is absolutely necessary accords with both our decided eases and with sound judicial policy.”). Restraint is particularly necessary here because our decision affects sensitive matters of national security, the consequences of which we have neither the information nor the perspicacity to predict. See Dep’t of Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (“courts traditionally have been reluctant to intrude ... in military and national security affairs”); Latif v. Obama, 677 F.3d 1175, 1182 (D.C.Cir.2012) (“Both the Constitution and common sense support judicial modesty” in this area because “the judiciary has the least competence and the smallest constitutional footprint.”); Humanitarian Law Project, 561 U.S. at 34, 130 S.Ct. 2705 (“[Njational security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess.”).
Further, excusing Bahlul’s forfeiture would not serve the interests of justice because he is concededly — and unapologet-ically — guilty of the charged offenses. Before the military commission, Bahlul candidly admitted to being a member of al Qaeda and engaging in all of the conduct attributed to him. See App. 190-94. Although he took one exception to the charge that he wore an explosive belt in order to *41 protect bin Laden, he also noted, “[T]his doesn’t mean that if I was given an explosive belt and bin Laden ... asked me to explode myself, that I wouldn’t do that. Of course, I would.” App. 194. He promised to continue “to fight America” if released “until the last drop of blood.” App. 161-62; see also App. 161 (“I will not leave the American government anywhere on the face of this earth.”). As I explain later, infra pp. 47-49, Bahlul’s conduct was indisputably illegal under international law, whether or not he was charged with an offense the international community expressly recognizes. See Marcus, 560 U.S. at 265, 130 S.Ct. 2159 (declining to exempt from plain-error review “errors that create a risk that a defendant will be convicted based exclusively on noncriminal conduct”). The notion that we should pardon Bahlul’s forfeiture is “so ludicrous as itself to compromise the public reputation of judicial proceedings.” Puckett, 556 U.S. at 143, 129 S.Ct. 1423; see also Cotton, 535 U.S. at 634, 122 S.Ct. 1781 (“The real threat ... to the ‘fairness, integrity, and public reputation of judicial proceedings’ would be if respondents, despite the overwhelming and uncontroverted evidence that they were [guilty], were to [benefit from] an error that was never objected to. at trial.”).
Finally, nothing prevented Bahlul from raising his constitutional challenges before the military commission. See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd., 571 F.3d 69, 76 (D.C.Cir.2009) (declining to forgive forfeiture because party “offer[ed] no justification for its delay”). Bahlul chose to “boycott” the proceedings in the hope it would “make the Muslims rise for [al Qaeda’s] cause.” App. 156, 162. By rejecting the assistance of counsel and voluntarily absenting himself from the proceedings, forfeiture was “one of the perils [Bahlul] assume[d].” United States v. Vonn, 535 U.S. 55, 73 n. 10, 122 S.Ct. 1043, 152 L.Ed.2d 90 (2002). Bahlul had every opportunity to raise his challenges and he must accept the consequences of his deliberate failure to do so. See Puckett, 556 U.S. at 136,129 S.Ct. 1423.
Nor is this a case where applying the ordinary rules of forfeiture would forever prevent de novo review of the constitutionality of the challenged provision. This concern may have been the principal motivation behind Schor. The law at issue in Schor permitted the CFTC to hear state-law counterclaims in reparations proceedings. 478 U.S. at 837,106 S.Ct. 3245. But the CFTC’s jurisdiction was non-exclusive: parties remained free to bring reparations claims in federal court. Id. at 836, 106 S.Ct. 3245. Thus, parties who chose to litigate before the CFTC arguably waived their right to complain about the CFTC’s adjudication of state-law counterclaims. The same was true for the parties who raised the counterclaims — which were permissive, not compulsory, under the relevant law. Id. at 837, 106 S.Ct. 3245. As a result, the Supreme Court faced a dilemma. If the ordinary rules of waiver applied, no court could ever determine whether the CFTC’s adjudication of state-law counterclaims violated the Judicial Power Clause of Article III. This Catch-22 likely animated the Schor Court’s decision to excuse the waiver and explains why it thought that “the parties cannot be expected to protect” the “institutional interests” behind Article III. Id. at 851, 106 S.Ct. 3245. Here, that concern is plainly absent because every enemy combatant has the ability — and incentive — to challenge .the military commission’s jurisdiction. See Bond v. United States, — U.S. -, 131 S.Ct. 2355, 2365, 180 L.Ed.2d 269 (2011) (“[T]he claims of individuals — not of Government departments- — -have been the principal source of judicial decisions concerning separation of powers and checks *42 and balances.”); Daniel J. Meltzer, Legislative Courts, Legislative Power, and the Constitution, 65 Ind. L.J. 291, 304 (1990) (“[T]he strategic interests of litigants substantially coincide with institutional interests protected by article III”). We can indeed check “the power of the political branches to sideline the federal courts,” Maj. Op. 5, once an enemy combatant properly preserves the argument. See Sharif, 135 S.Ct. at 1948 (“the Article III right is substantially honored” notwithstanding courts “permitting waiver” in some cases).
In sum, I believe my colleagues err by parting ways with the en banc court and reviewing Bahlul’s Article III challenge de novo. Their decision to sidestep the plain-error standard reads too much into an obscure passage from Schor — a reading the Supreme Court disavowed in Plant and overruled in Sharif— and ignores important distinctions between civil and criminal cases. Cf Sharif, dissenting op. at 1970 (Thomas, J.) (Article III issues “cannot — and should not — be resolved through a cursory reading of Schor, which itself is hardly a model of careful constitutional interpretation”).
Applying the plain-error standard of review, I would easily reject Bahlul’s challenges to his conspiracy conviction. The plain-error standard is “difficult” to satisfy, “as it should be.” United States v. Dominguez Benitez, 542 U.S. 74, 83 n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004). The forfeited error must be “so obvious” that “the trial judge and prosecutor were derelict in countenancing it.” Bolla, 346 F.3d at 1153. Here, the Congress’s decision to authorize the trial of conspiracy by military commission did not plainly transcend Article III, as the en banc court’s decision and my colleague’s concurrence impliedly recognize. See Bahlul, 767 F.3d at 18-27; Concur. Op. 22-24. At the very least, “the lack of prior precedent ... and the novelty of the issue presented militate against calling th[is] mistake plain error.” United States v. Blackwell, 694 F.2d 1325, 1342 (D.C.Cir.1982); see also United States v. Terrell, 696 F.3d 1257, 1260 (D.C.Cir.2012) (error not plain unless “a clear precedent in the Supreme Court or this circuit established] its erroneous character”). Thus, no matter one’s view of the merits, Bahlul cannot satisfy the “plainness” requirement of the plain-error standard. See Olano, 507 U.S. at 732, 113 S.Ct. 1770. Nor do I believe he can satisfy the “error” requirement, a topic I turn to now.
II. THE CONSTITUTIONAL CHALLENGES
Bahlul argues that (i) the Congress — in codifying conspiracy to commit war crimes as an offense triable by military commission — exceeded its Article I powers and independently violated Article III; (ii) he was convicted based on his thoughts, beliefs and ideals in contravention of ■ the First Amendment; and (iii) the 2006 MCA discriminates against him as an alien in violation of the equal protection component of the Fifth Amendment. The latter two arguments are frivolous on their face. See infra Part II.C. Bahlul’s Article I and Article III arguments, however, warrant a more thorough examination.
As detailed below, the Congress acted within its Article I authority and did not contravene any personal or structural Article III principles in codifying conspiracy as an offense triable by military commission. Bahlul’s conspiracy trial and conviction were sanctioned by the President,[9] “pursu *43 ant to an express ... authorization of Congress.” Youngstown, 343 U.S. at 635, 72 S.Ct. 863 (Jackson, J., concurring). Their constitutionality is therefore “supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion ... rest[s] heavily upon” Bahlul to rebut it. Id. at 637, 72 S.Ct. 863. Additionally:
[T]he detention and trial of petitioner[] — ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger — are not to be set aside by the courts without the clear conviction that they are in conflict with the Constitution....
Ex parte Quirin, 317 U.S. 1, 25, 63 S.Ct. 2, 87 L.Ed. 3 (1942) (emphasis added).[10]
A. ARTICLE I
Bahlul begins with an uncontroversial premise: “law-of-war military commissions” can try only those “offenses against the law of war.” Pet’r’s Br. 12 (quoting Bahlul, 767 F.3d at 7). But he then embroiders that premise with needlework that produces naught but knots. First, he insists that the Congress’s power to codify a law-of-war offense derives exclusively from the Define and Punish Clause, U.S. CONST, art. I, § 8, cl. 10. Second, he argues that the Define and Punish Clause allows the Congress to codify a law-of-war offense only if the international community has expressly agreed, element-by-element, that the offense is cognizable. And based on the Government’s concession that “conspiracy has not attained recognition at this time as an offense under customary international law,” Gov’t’s En Banc Br. at 34, Bahlul insists that “[t]he answer ... is both plain and uncontested”: conspiracy falls outside the Congress’s Article I power. Pet’r’s Br. 24.
Both of Bahlul’s embroidered premises are wrong. Even under the Define and Punish Clause alone, the Congress has the constitutional authority to codify conspiracy to commit war crimes by military commission. The international community does recognize that Bahlul violated “the principles of the law of nations, as they result from the usages established among civilized peoples, from the laws of humanity and the dictates of the public conscience,” Quirin, 317 U.S. at 35, 63 S.Ct. 2, and the Congress has done nothing more than provide for “the limits or precise meaning” of those principles in authorizing the trial and sentencing by military commission for the violation thereof. 11 U.S. Op. Atty. Gen. 297, 299 (1865) (then-Attorney General James Speed’s review of Lincoln conspirators’ trial).
Bahlul’s other embroidered premise fares no better. The Congress does not derive its power to enumerate war crimes triable by military commission solely from the Define and Punish Clause. As the *44 Supreme Court has recognized, the “capture, detention, and trial of unlawful combatants” are “ ‘important incidents of war,’ ” Hamdi v. Rumsfeld, 542 U.S. 507, 518, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality) (quoting Quirin, 317 U.S. at 28, 63 S.Ct. 2 (emphases added) (alteration omitted)), and the Congress’s power to conduct war, in all of its “incidents,” necessarily derives from its several Article I war powers mutatis mutandis. “[U]nlike the Define and Punish Clause, ... the other Article I war powers clauses do not refer to international law and are not defined or constrained by international law.” Bahlul, 767 F.3d at 73 (Kavanaugh, J., concurring/dissenting).
1. Define and Punish Clause
The Define and Punish Clause declares that “[t]he Congress shall have Power ... [t]o define and punish Piracies and Felonies committed on the high Seas, and Of-fences against the Law of Nations.” U.S. Const, art. I, § 8, cl. 10. The power to “define” means that the Congress can “determine,” “decide” or “lay down definitely” offenses against the law of nations. Define, Oxford English DictionaRY (2d ed.1989). The word “define” — especially joined by the conjunction “and” — has teeth.
At the Constitutional Convention, the debate over the Define and Punish Clause focused on whether the Congress should be given the power to do more than merely punish violations of the law of nations. An early draft of the Clause recited that the Congress could “define & punish pira-cies and felonies on the high seas” but could only “punish offenses agst. the law of nations.” Charles D. Siegal, Deference and Its Dangers: Congress’ Power to “Define ... Offenses Against the Law of Nations”, 21 Vand. J. Transnat’l L. 865, 876 (1988) (quoting 2 The Reoords of the Federal Convention of 1787, at 614 (Farrand ed. 1937) (Madison’s notes)- (emphasis added)). Gouverneur Morris, a Pennsylvania delegate to the Constitutional Convention, “moved to strike out ‘punish’ before the words ‘offenses agst. the law of nations’ ” so that they would be “definable as well as punishable, by virtue of the preceding member of the sentence.” 'Id. (emphasis in original). James Wilson, another Pennsylvania delegate, objected, arguing that “[t]o pretend to define the law of nations” would give the drafters a “look of arrogance” and “make us ridiculous.” Id. (emphasis in original). In rejoinder, Morris explained that passive reliance on the international community was unworkable because “the law of nations [is] often too vague and deficient to be a rule.” Id. (alterations omitted); see also The Federalist No. 42, at 266 (Madison) (explaining that “define” power was necessary to secure “certainty and uniformity”). Morris’s approach carried the day, establishing that the Congress was not reflexively to follow other nations’ lead in formulating offenses but instead to contribute to their formulation. See Peter Margulies, Defining, Punishing, and Membership in the Community of Nations: Material Support and Conspiracy Charges in Military Commissions, 36 Fordham Int’l L.J. 1, 27 (2013) (“Morris’s concern suggested that Congress would play a valuable role by not merely defining the law of nations in a mechanical fashion, but refining that occasionally turgid and murky stream of disparate sources.”); cf. 2 The Records of the Federal Convention of 1787, at 316 (Morris) (“define ... was said by others to be applicable to the creating of offences”).
The Clause’s history and text suggest two principles helpful to our interpretive task. The first is that international law derives from “a myriad of sources” and is “vast and always changing.” Margulies, supra, at 24; see also Bahlul, 767 F.3d at *45 54 (Brown, J., concurring/dissenting). Justice Joseph Story, in 1820, recognized the varying nature of international law, observing that “[ojffences ... against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognised by the common consent of nations,” and therefore the Congress was given the “power to define.” United States v. Smith, 18 U.S. 153, 159, 5 Wheat. 153, 5 L.Ed. 57 (1820). The observation has stood the test of time. As declared at the Nuremburg International Military Tribunal that tried the World War II war criminals:
[International law is not the product of an international legislature, and ... international agreements ... have to deal with general principles of law.... The law of war is to be found not only in treaties, but in the customs and practices of states which gradually obtained universal recognition, and from the general principles of justice applied by jurists and practiced by military courts. This law is not static, but by continual adaptation follows the needs of a changing world.”
1 Int’l MilitaRY TribuNAL (IMT), Trial op the Major War Criminals Before the International Military Tribunal: Nuremberg 221 (1947).
The second principle is that “[t]he judiciary must give Congress extraordinary deference when it acts under its Define and Punish Clause powers.” Bahlul, 767 F.3d at 59 (Brown, J., concurring/dissenting). The Framers recognized that “[d]e-fining and enforcing the United States’ obligations under international law require the making of extremely sensitive policy decisions, decisions which will inevitably color our relationships with other nations.” Finzer, 798 F.2d at 1458 (emphasis added). “[S]uch decisions ‘are delicate, complex, and involve large elements of prophecy.... They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility.’ ” Id. at 1458-59 (quoting Chi. & S. Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948)). Indeed, “[judicial deference to such congressional definition is but a corollary to the grant to Congress of any Article I power.” Eldred v. Ashcroft, 537 U.S. 186, 218, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) (emphasis added) (quotation marks omitted).
■ The Supreme Court has remained faithful to these principles in the few instances in which it has examined the prosecution of war crimes by military commission. The first instance was Quirin. There, the Court had no difficulty concluding that the offenses charged against the Nazi saboteurs — espionage and sabotage — had “generally been accepted” as punishable by military commission under international law. Quirin, 317 U.S. at 31-36, 63 S.Ct. 2. The offenses with which the saboteurs were charged, according to the Quirin Court, resulted from conduct “plainly” recognized as violative of the law of war. Id. at 46, 63 S.Ct. 2.
But the precedent my colleagues cannot reconcile with their Define and Punish Clause holding is Application of Yamashi-ta, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946). At the time Japanese Commander Yamashita assumed command, General MacArthur’s troops were waging their assault on, and ultimate liberation of, the Philippines. Id. at 31-32, 66 S.Ct. 340 (Murphy, J., dissenting). Although Allied victory was imminent, Yamashita’s army troops and naval forces “exterminate[d] a large part [more than 25,000] of the civilian population of Batangas Province.” Id. at 14, 66 S.Ct. 340 (majority op.). While the crimes committed by Yamashita’s sol- *46 diets and sailors were “recognized in international law as violations of the law of war,” Yamashita himself was not charged with participating in,' or directing, their commission but instead with “fail[ing] to discharge his duty as commander to control ... the members of his command.” Id. at 13-14, 66 S.Ct. 340. The difficulty, then, was that international law did not expressly provide that a war-time commander could be prosecuted for failing to stop those under his command from committing war crimes. See Siegal, supra, at 883 (noting international law “dealt only tangentially with the issue” and “no provision dealt specifically with a commander’s obligation to control his troops”). Nevertheless, the Court affirmed Yamashita’s conviction and capital sentence.
In so doing, the Court framed the question as follows:
[W]hether the law of war imposes on an army commander a duty to take such appropriate measures as are within his power to control the troops under his command for the prevention of the specified acts which are violations of the law of war and which are likely to attend the occupation of hostile territory by an uncontrolled soldiery, and whether he may be charged with personal responsibility for his failure to take such measures when violations result.
Yamashita, 327 U.S. at 14-15, 66 S.Ct. 340. The Court looked to four international-law sources for an answer. Although none directly addressed whether a commanding officer’s failure to affirmatively prevent his troops from committing war crimes was itself a war crime, the Fourth Hague Convention of 1907 established that armed forces could be considered lawful belligerents only if commanded by an individual “responsible for his subordinates.” Id. at 15, 66 S.Ct. 340 (quoting 36 Stat. 2295). Article 43 of the Annex to the Fourth Hague convention required a commander occupying enemy territory to “take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country.’’ Id. at 16, 66 S.Ct. 340 (quoting 36 Stat. 2306) (emphases added).[11] Notwithstanding the absence of international authority outlawing a commander’s failure to affirmatively prevent those under his command from committing war crimes, the Court was not deterred, finding it “evident that the conduct of military operations by troops whose excesses are unrestrained by the orders or efforts of their commander would almost certainly result in violations which it is the purpose of the law of war to prevent.” 327 U.S. at 15, 66 S.Ct. 340 (emphasis added). That “purpose ... would largely be defeated if the commander ... could with impunity neglect to take reasonable measures for their protection.” Id. “Hence the law of war presupposes that its violation is to be avoided through the control of the operations of war by commanders who are to some extent responsible for their subordinates.” Id. (emphasis added).
The holding was attacked — molto agita-to — by the two dissenting Justices, see id. at 35, 66 S.Ct. 340 (Murphy, J., dissenting) (noting that “[i]nternational law ma[de] no attempt to define the duties of a command *47 er of an army under constant and overwhelming assault; nor [did] it impose liability under such circumstances”); id. at 43, 66 S.Ct. 340 (Rutledge, J., dissenting), on the same ground Bahlul today urges. Justice Murphy’s criticism was sweeping: “Nothing in all history or in international law” established that “such a charge against a fallen commander of a defeated force” constituted a war crime. Id. at 35, 66 S.Ct. 340 (Murphy, J., dissenting); see also Eugene Kontorovieh, Discretion, Delegation, and Defining in the Constitution’s Law of Nations Clause, 106 Nw. U.L.Rev. 1675, 1736 (2012) (charge in Ya-mashita was upheld “with some general and not quite on-point citations to the Hague Conventions.”).[12]
Mindful of the two principles discussed above — the inherently fluid nature of international law and the deference owed to the Congress’s power to define offenses against the law of nations — we should examine whether the international community permits Bahlul to be tried by military commission rather than requiring that the charge against him, as defined by the Congress, matches an offense expressly recognized by the law of nations as a war crime.
Bahlul was convicted of “conspiracy to commit war crimes.” Bahlul, 767 F.3d at 5.[13] The 2006 MCA defines conspiracy as including any enemy combatant “who conspires to commit one or more” law-of-war offenses and “who knowingly does any overt act” in furtherance thereof. 10 U.S.C. § 950v(28) (2006). As is common in the United States, the conspiracy offense set out in the 2006 MCA has two elements: an agreement to commit a war crime and an overt act in furtherance of that agreement. Cf, e.g., 18 U.S.C. § 371.
In civil-law countries, conspiracy is instead viewed as a type of vicarious liability requiring proof of a completed offense. See Margulies, supra, at 84. Inchoate conspiracy has been internationally recognized, however, in connection with certain war crimes. See 1 IMT, supra, at 224-26 (“common plan” to wage aggressive war); Updated Statute of the International Criminal Tribunal for the Former Yugoslavia, art. 4 (2009) (making punishable “conspiracy to commit genocide” as well as incitement or attempt to commit genocide and complicity in genocide); Statute of the International Criminal Tribunal for Rwanda, art. 2 (1994) (same); Convention on the Prevention and Punishment of the Crime of Genocide, art. 3 (1948) (same). ' Additionally, international law recognizes “joint criminal enterprise” (JCE). See Prosecutor v. Tadic, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 220 (Int’l Crim. Trib. for the Former Yugoslavia July 15, 1999). JCE has three essential elements: “a plurality of persons participating in the criminal plan,” “the existence of a common purpose which amounts to or involves the *48 commission of a crime,” and “the accused’s participation in the common design.” Giu-lia Bigi, Joint Criminal Enterprise in the Jurisprudence of the International Criminal Tribunal for the Former Yugoslavia and the Prosecution of Senior ' Political and Military Leaders: The Krajisnik Case, in 14 Max PlancK YeaRbook of United Nations Law 56 (A. von Bogdandy & R. Wolfram eds.2010).
At one point, my colleagues suggest that the conspiracy offense set out in the 2006 MCA is inconsistent (as opposed to not recognized in haec verba) with international law. They note that “[t]he International Military Tribunal at Nuremberg considered and rejected conspiracy to commit war crimes as an international law of war offense.” Maj. Op. 15. The Nurem-burg Tribunal, however, did recognize one inchoate conspiracy offense: “common plan” to. wage aggressive war. 1 IMT, supra, at 224-26. The Congress is aware of this history and could have legitimately concluded that the international community would agree that the September 11, 2001 attacks are sufficiently abhorrent to impose inchoate-conspiracy liability. Importantly, the “jurisdiction” of the military commission has traditionally been “adapted in each instance to the need that called it forth,” Madsen v. Kinsella, 343 U.S. 341, 347-48, 72 S.Ct. 699, 96 L.Ed. 988 (1952),[14] and international terrorism is “the global security challenge of the 21st Century.” Bahlul, 767 F.3d at 61 (Brown, J., concurring/dissenting). Furthermore, international law has developed since the Nuremberg trials of seventy years ago. International tribunals now prosecute JCE, which “functions in ways virtually identical to” inchoate conspiracy. Allison Marston Danner & Jenny S. Martinez, Guilty Associations: Joint Criminal Enterprise, Command Responsibility, and the Development of International Criminal Law, 93 Cal. L.Rev. 75, 119 (2005). Thus, the hesitation of certain Allies at Nuremberg — that “overbroad application of the conspiracy principle may drag innocent people into the prosecution’s net,” Telford Taylor, The Anatomy of the Nuremberg Trials: A Personal Memoir 553 (1992) — appears to have been removed by the international community. Indeed, JCE allows the prosecution as war criminals of those who join together and participate in a criminal plan, which plan’s purpose “amounts to” the commission of a crime. Bigi, supra, at 56; see also Tadic, supra, at ¶ 199. Bahlul joined with other al Qaeda members and participated[15] in *49 the plan to attack our country on September 11, 2001, which plan’s purpose — to murder civilians — “amounts to” the commission of a war crime.
Discernible in this brief discussion is a common animating principle that, notwithstanding the differences in descriptive labels or elements, individuals who join together to further the commission of a war crime violate the law of war. Granted, the Congress did not include proof of a completed war crime as an element of the conspiracy offense included in the 2006 MCA. My colleagues characterize this omission as the creation of a new, purely “domestic ” offense, as if it were made out of whole cloth. Maj. Op. 10. In my view, the Congress has taken a preexisting international law-of-war offense — conspiracy to commit war crimes — and eliminated one element. This it is constitutionally authorized to do within its “power to define” that Justice Story wrote about almost 200 years ago. Smith, 18 U.S. at 159, 18 U.S. 153; see also Bahlul, 767 F.3d at 57 (Brown, J., concurring/dissenting).
Nor does the Define and Punish Clause require the Congress to wait for the international community to catch up. The Ya-mashita Court did not play “Mother, may I” with established international law. See 327 U.S. at 15-16, 66 S.Ct. 340. Instead, it used what it viewed as the international law of war’s “presupposition]” and “purpose” in order to uphold Yamashita’s conviction of “failure to prevent” war crimes, which failure “resulted] in” war crimes it was “the purpose of the law of war to prevent.” Id. at 15-16 & n. 3, 66 S.Ct. 340. Moreover, it upheld Yamashita’s war crimes convictions for omissions to act; even more cognizable as war crimes, then, are Bahlul’s commissions. See swpra pp. 48-49 n. 15. And today, in our post-Ane world, we recognize that there is no “transcendental body of law outside of any particular State.” Erie R. Co. v. Tompkins, 304 U.S. 64, 79, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Law is created, not discovered, and it changes based on the actions of individual sovereigns. As one commentator puts it:
[I]nternational law has grown more fluid and responsive to shifts in international consensus. The United States’ influence on international law has changed as well: the twentieth century saw the nation develop into a superpower, one that, when it trims its sails, can cause the winds of international law to blow in a new direction.
Note, The Offences Clause After Sosa v. Alvarez-Machain, 118 Harv. L.Rev. 2378, 2390 (2005); see also Stewart Jay, The Status of the Law of Nations in Early American Law, 42 VaND. L.Rev. 819 (1989). *50 In my view, the Congress can, consonant with the Define and Punish Clause, track somewhat ahead of the international community. The United States can be the standard bearer and take the reins in resolving difficult questions of international law related to the ongoing threat of international terrorism. See Bahlul, 767 F.3d at 61 (Brown, J., concurring/dissenting) (“Perhaps the United States should be a leader in this area — a leader in international law commensurate with its status as a military leader in the war on terror— recognizing the offense of conspiracy to commit acts of terrorism.”).[16]
My colleagues’ narrow view of the Congress’s authority under the Define and Punish Clause, requiring that a law-of-war offense be already recognized by the international community on an element-by-element basis, follows, they believe, from Quirin and Hamdan. In my view, these two cases did not set the outer limits of the Congress’s authority because neither involved an exercise of the Congress’s power to “define” the law of nations. The military commissions in Hamdan and Qui-rin operated under section 821 (or its predecessor), giving military commissions jurisdiction of “offenses that by statute or by the law of war may be tried by military commissions.” 10 U.S.C. § 821 (emphasis added). By enacting this statute, however, the Congress did not “itself undertake[ ] to ... define” the law of war but instead left its definition to the courts. Quirin, 317 U.S. at 29-30, 63 S.Ct. 2. Accordingly, to determine whether an offense was covered by section 821, the Supreme Court had to survey the “common law” of war, id. at 30, 63 S.Ct. 2; Hamdan, 548 U.S. at 593, 126 S.Ct. 2749, which is necessarily limited to the offenses already recognized as triable by military commission. See Hamdan, 548 U.S. at 595, 126 S.Ct. 2749 (plurality) (“The common law governing military commissions may be gleaned from past practice and what sparse legal precedent exists.”); see also Quirin, 317 U.S. at 29, 63 S.Ct. 2 (looking to what “our courts” have recognized as “violations of the law of war”).
In Hamdan, however, five Justices emphasized that their task would have been considerably easier had the Congress affirmatively defined conspiracy as an offense against the law of war. See 548 U.S. at 601-02, 126 S.Ct. 2749 (plurality) (noting Congress had not “positively identified ‘conspiracy’ as a war crime”); id. at 612, 126 S.Ct. 2749 (noting “the absence of specific congressional authorization”); id. *51 at 595, 126 S.Ct. 2749 (majority op.) (same); id. at 636, 126 S.Ct. 2749 (Breyer, J., concurring) (“Nothing prevents the President from returning to Congress to seek the authority he believes necessary.”). As Justice Kennedy put it:
I ... see no need to address the validity of the conspiracy charge.... Congress may choose to provide further guidance in this area. Congress, not the Court, is the branch in the better position to undertake the “sensitive task of establishing a principle not inconsistent with the national interest or with international justice.”
Id. at 655, 126 S.Ct. 2749 (Kennedy, J„ concurring in part) (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 428, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)).
Heeding this call, the Congress provided such guidance by enacting the 2006 MCA, which expressly enumerates conspiracy as a law-of-war offense triable by military commission. See 10 U.S.C. § 950v(28) (2006). Inexplicably, my colleagues suggest that the Congress was not exercising its power to “define” the law of nations in enacting the challenged provision. Maj. Op. 16; Concur. Op. 24-25. The en banc court, however, necessarily recognized that the Congress was exercising its power to “define” in the 2006 enactment. See Bah-lul, 767 F.3d at 13 (“[T]he 2006 MCA ... provides the President the very power he sought to exercise in Hamdan — the power to try the 9/11 perpetrators for conspiracy ... by military commission.... We must heed this inter-branch dialogue.” (citations omitted)); id. at 26 (“[T]he elements of the conspiracy charge were not defined by statute in Hamdan.... Here, the Congress has positively identified conspiracy as a war crime.” (citation omitted)). Moreover, the legislative history accompanying the 2006 MCA makes plain that the Congress viewed itself as acting pursuant to its authority under the Define and Punish Clause.[17] My colleagues rely on the Government’s failure to argue this point but we “retain[ ] the independent power to identify and apply the proper construction of governing law.” U.S. Nat’l Bank of Oregon v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 446, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). And, to the extent we consider the parties’ characterizations of what the Congress did, Bahlul himself concedes that the Congress “codified a conspiracy offense ... in a self-conscious exercise of its power under the Define & Punish Clause.” Pet’r’s Br. 22; see also id. at 21-22 (“The Define & Punish Clause is the authority ... to which Congress looked when enacting the 2006 Act.” (citing H.R.Rep. No. 109-664, pt. 1, at 24)); id. at 25 (“Congress enacted [the challenged provision] in explicit reliance on its power under the Define & Punish Clause.”). Contrary to my colleagues’ suggestion, Maj. Op. 16, the Congress does not need to incant any magic words to invoke its “define” power. See Arjona, 120 U.S. at 488, *52 7 S.Ct. 628 (if “[a] statute defines the offense, ... there is no more need of declaring in the statute that it is ... an offense [against the law of nations] than there would be in any other criminal statute to declare that it was enacted to carry into execution any other particular power”).
.Bahlul’s conspiracy conviction thus stands on firmer constitutional footing than Hamdan’s, Quirin’s or even Yamashi-ta’s convictions. The Congress has in fact exercised its Article I power to “define” conspiracy as an offense against the law of nations. The difference between this case and Hamdan is the difference between Justice Jackson’s first and third categories, respectively. See Youngstown, 343 U.S. at 635-38, 72 S.Ct. 863 (Jackson, J., concurring). The Congress has used its expertise in national security and military affairs, see Finzer, 798 F.2d at 1458-59, which warrants the Judiciary’s utmost deference. Unlike my colleagues, I would not treat this case as another Quirin or Ham-dan. Every Justice in Hamdan who ruled against the Government necessarily recognized that a case like Bahlul’s would present a much easier question. Here, the Congress and the President have acted in concert, cloaking their actions “with all the attributes of sovereignty.”- Youngstown, 343 U.S. at 635 n. 2, 72 S.Ct. 863 (Jackson, J., concurring). We should “hesitate long before limiting or embarrassing such powers,” id. (emphasis omitted) — much longer and harder than my colleagues have hesitated here.
Accordingly, the Congress’s decision to defihe conspiracy to commit war crimes as an offense against the law of war triable by military commission is consistent with international law — even if not a perfect match. Add to that the elevated level of deference we give the Congress in exercising its Article I powers and, to me, the inclusion of conspiracy to commit war crimes in the 2006 MCA is plainly within its authority under the Define and Punish Clause.
2. Necessary and Proper Clause
Next, the Necessary and Proper Clause augments the Congress’s already ample Define and Punish Clause authority to codify conspiracy as a law-of-war offense triable by military commission. The Supreme Court has made plain that, “in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a’ particular federal statute,” courts “look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power.” United States v. Comstock, 560 U.S. 126, 134, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010); see also Gonzales v. Raich, 545 U.S. 1, 22, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (statute falls within Necessary and Proper Clause if “Congress had a rational basis” for concluding statute implements another enumerated Article I power). The constitutionally enumerated power here — the Define and Punish Clause — allows the Congress, at a minimum, to codify Bah-lul’s object offenses (e.g., murder in violation of the law of war) as war crimes triable by military commission. See Qui-rin, 317 U.S. at 29, 63 S.Ct. 2. Trying by military commission those who conspire to commit war crimes is “convenient,” “useful,” and “ ‘conducive’ to the ... ‘beneficial exercise’ ” of the Congress’s power to authorize the trial of substantive war crimes and doing so is abundantly rational. Comstock, 560 U.S. at 133-34, 130 S.Ct. 1949- (quoting M’Culloch v. Maryland, 17 U.S. 316, 413, 418, 4 Wheat. 316, 4 L.Ed. 579 (1819)).
In Comstock, the Supreme Court held that the Necessary and Proper Clause *53 granted the Congress the authority to enact a civil-commitment statute allowing the Department of Justice to detain certain federal prisoners beyond their release date. Id. at 129-30, 130 S.Ct. 1949. It based its holding on “five considerations”: (1) the Necessary and Proper Clause, “grants Congress broad authority to enact federal legislation,” id. at 133, 130 S.Ct. 1949; (2) the civil-commitment statute was a “modest addition” to preexisting law, id. at 137, 130 S.Ct. 1949; (3) the Congress had sound reasons for the statute and the statute was “reasonably adapted” thereto, id. at 142-43, 130 S.Ct. 1949; (4) the statute “properly accounts for state interests,” id. at 143, 130 S.Ct. 1949; and (5) the connection between the statute and an enumerated Article I power was “not too attenuated” and the statute was not “too sweeping in its scope,” id. at 146,130 S.Ct. 1949. Here, each of these considerations indicates that the Congress acted within its constitutional authority.
First, as Comstock emphasized, the Congress’s power under the Necessary and Proper Clause is broad. See id. at 133, 130 S.Ct. 1949; see also Armstrong v. Exceptional Child Center, Inc., - U.S. -, 135 S.Ct. 1378, 1383, 191 L.Ed.2d 471 (2015) (Necessary and Proper Clause “vests Congress with broad discretion over the manner of implementing its enumerated powers”). Indeed, in M’Culloch, “Chief Justice Marshall emphasized that the word ‘necessary’ does not mean ‘absolutely necessary.’ ” Comstock, 560 U.S. at 134, 130 S.Ct. 1949 (quoting M’Culloch, 17 U.S. at 413-15 (emphasis omitted)). Rather, he wrote:
Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.
M’Culloch, 17 U.S. at 421. For this reason, courts deciding whether the Necessary and Proper Clause supports a piece of legislation ask only “whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power.” Comstock, 560 U.S. at 134, 130 S.Ct. 1949; see also Sabri v. United States, 541 U.S. 600, 605, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) (using “means-ends rationality” to describe necessary relationship). Moreover, the “choice of means” lies “primarily” with “the judgment of Congress” and “the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted, and the end to be attained, are matters for congressional determination alone.” Burroughs v. United States, 290 U.S. 534, 547-48, 54 S.Ct. 287, 78 L.Ed. 484 (1934).
Second, the Congress, through the 2006 MCA, legislated in an area that is exclusively federal, not simply one with a “long history of federal involvement.” Com-stock, 560 U.S. at 149,130 S.Ct. 1949. The Supreme Court has long held that “the government of the United States has been vested exclusively with the power of representing the nation in all its intercourse with foreign countries,” Arjona, 120 U.S. at 483, 7 S.Ct. 628, and that states are “expressly prohibited from entering into any ‘treaty, alliance, or confederation.’ ” Id. (quoting U.S. Const, art. I, § 10, cl. 1). In fact, the Define and Punish Clause itself recognizes that “[t]he national government is ... responsible to foreign nations for all violations by the United States of their international obligations.” Id.
Third, the Congress has indisputably sound reasons for codifying conspiracy as a war crime triable by military commission. As the Supreme Court has ex *54 plained, “[Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality.” Callanan v. United States, 364 U.S. 587, 593, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961). Bahlul himself recognized this fact at his military-commission trial. He stated that he had “asked bin Laden for a martyrdom operation, a suicide operation; but [bin Laden] refused.” App. 194. He was instead put in charge of propaganda because, according to bin Laden, “recruiting people through media gets you more people than suicidal attacks.” Id. Furthermore, there is no principled reason to prevent the United States — or any member of the international community, for that matter — from subjecting to military justice those enemy combatants who plot, but fail, to commit war crimes. Once conspirators enter into an agreement, their “[c]riminal intent has crystallized, and the likelihood of actual, fulfilled commission warrants preventive action.” United States v. Feola, 420 U.S. 671, 694, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) (emphasis added).
Fourth, for the reasons discussed in the second point, supra, the challenged provision does not infringe on any state interest.
Fifth, the link between the Congress’s decision to authorize trial of conspiracy to commit war crimes by military commission and its undisputed power to authorize trial of other war crimes by military commission is not attenuated. Indeed, under the challenged provision, an enemy combatant tried by military commission can be convicted of conspiracy only if the Government proves that he agreed to commit, and took acts in furtherance of committing, a war crime. There is no question that the object offenses underlying Bahlul’s conspiracy conviction — which the Government proved or Bahlul conceded — violated the international law of war. See, e.g, Findings Worksheet 2 (Bahlul convicted of conspiring to “murder ... protected persons”); Rome Statute of the International Criminal Court, art. 8, July 17, 1998, 2187 U.N.T.S. 90 (murder of civilians constitutes international war crime). Nor is the conspiracy provision of the 2006 MCA sweeping in scope.
Bahlul makes no attempt to distinguish Comstock, arguing instead that United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955), forecloses application of the Necessary and Proper Clause. But Toth, a case involving the court-martial trial of an Army veteran who had been honorably discharged, id. at 13, 76 S.Ct. 1, is beyond inapposite. In Toth, the Supreme Court rejected an attempt to use the Necessary and Proper Clause to supplement the Congress’s power “[t]o make Rules for the Government and Regulation of the land and naval Forces.” Id. at 14, 76 S.Ct. 1 (quoting U.S. Const, art. I, § 8, cl. 14). The Court declared that the Make Rules Clause “authorizes Congress to subject persons actually in the armed service to trial by court-martial for military and naval offenses.” Id. (emphasis added). It gave two reasons that the Congress had exceeded its Article I authority by trying Toth, by then a civilian, via court-martial: (1) the Necessary and Proper Clause did not empower the Congress “to deprive people of trials under Bill of Rights safeguards”; and (2) it was “impossible to think that the discipline of the Army [was] going to be disrupted, its morale impaired, or its orderly processes disturbed, by giving exservicemen the benefit of a civilian court trial when they [were] actually civilians.” Id. at 22, 76 S.Ct. 1.
Neither of these concerns exists here. There is no risk that a countervailing constitutional right supersedes the Necessary *55 and Proper Clause because Bahlul — an alien enemy combatant outside the sovereign United States — is not protected by the Bill of Rights. See infra Part II.B.2. In addition, the Supreme Court’s holding that Toth could not be tried by court-martial was, by necessary implication, a determination that the trial of a citizen by court-martial was not “rationally related” to the Congress’s authority under the Make Rules Clause. Comstock, 560 U.S. at 134, 130 S.Ct. 1949.[18] The Army would gain nothing in discipline or morale by court-martialing an individual who was no longer a service member. See Toth, 350 U.S. at 22, 76 S.Ct. 1. As just discussed, supra pp. 53-54, the Congress’s inclusion of conspiracy to commit war crimes as an offense triable by military commission is rationally related to its unquestioned authority to make war crimes themselves triable by military commission. And trying conspiracy by military commission is not inconsistent with international law. Cf. M’Culloch, 17 U.S. at 421. Conspiracy to commit war crimes is not a purely “domestic ” offense, Maj. Op. 10, but instead is in accord with the international community’s agreement that those who conspire to commit war crimes can be punished as war criminals. See supra Part II.A.1.
To the extent there is any doubt that the Congress has the power to “define” conspiracy as a war crime and “punish” it by military commission, the Necessary and Proper Clause is more than sufficient to remove it.
3. Broader War Powers
“[0]ut of seventeen specific paragraphs of congressional power, eight of them are devoted in whole or in part to specification of powers connected with warfare.” Johnson v. Eisentrager, 339 U.S. 763, 788, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). Specifically, the Congress has the power:
• “[T]o ... provide for the common De-fence and general Welfare of the United States,” U.S. Const, art. I, § 8, cl. i;
• “To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations,” id. cl. 10;
• “To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water,” id. cl. 11;
• “To raise and support Armies,” id. cl. 12;
• “To provide and maintain a Navy,” id. cl. 13;
• “To make Rules for the Government and Regulation of the land and naval Forces,” id. cl. 14;
“To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions,” id. cl. 15; and
• “To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress,” id. cl. 16.
*56 Supreme Court precedent, Colonel Winthrop’s influential treatise and our constitutional history all support the proposition that the Congress’s authority to specify law-of-war offenses triable by military commission is also supported by its broader war powers.

a. Supreme Court Precedent

The Supreme Court -has recognized the breadth of the Congress’s war powers, both individually and in combination. See, e.g., Rostker, 453 U.S. at 65, 101 S.Ct. 2646 (“The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping.”); Wayte v. United States, 470 U.S. 598, 612, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (“Unless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning. Recognizing this fact, the Framers listed ‘providing] for the common defence’ [in the Preamble] as a motivating purpose for the Constitution.... ”). The Congress’s war powers include the creation and use of military commissions. “Since our nation’s earliest days, such commissions,” also called “our commonlaw war courts,” “have been constitutionally recognized agencies for meeting many urgent governmental responsibilities related to war.” Madsen, 343 U.S. at 346-47, 72 S.Ct. 699. Historically, “their procedure” and “their jurisdiction ” have been “adapted in each instance to the need that called [them] forth.” Id. at 347-48, 72 S.Ct. 699 (citing Yamashita, 327 U.S. at 18-23, 66 S.Ct. 340 (emphasis added)).
The Supreme Court has never expressly held that the Congress’s power to provide for law-of-war military commissions stems from the Define and Punish Clause alone. Instead, its limited jurisprudence indicates that the combined effect of the Congress’s war powers allows for military-commission trials as their need arises. A century before Madseri, four Justices opined that “the power of Congress ... to authorize trials for crimes against the security and safety of the national forces, may be derived from its constitutional authority to raise and support armies and to declare war.” Ex parte Milligan, 71 U.S. 2, 142, 4 Wall. 2, 18 L.Ed. 281 (1866) (Chase, C.J., concurring in judgment).
Moreover, nothing in Quirin suggests that the Supreme Court intended to limit the Congress’s war powers to the Define and Punish Clause in setting the jurisdiction of military commissions. In fact, the Quirin Court took pains to emphasize that “[w]e have no occasion now to define with meticulous care the ultimate boundaries of the jurisdiction of military tribunals to try persons according to the law of war.” 317 U.S. at 45-46, 63 S.Ct. 2. Quirin held only, on the facts of that case, that the Congress’s power under the Define and Punish Clause provided sufficient authority to support the charges made against the Nazi saboteurs. See id. at 46, 63 S.Ct. 2 (“We hold only that those particular acts constitute an offense against the law of war which the Constitution authorizes to be tried by military commission.” (emphasis added)). Quirin did not purport to read out the Congress’s other war powers; in fact, it expressly recognized and listed them. See id. at 26, 63 S.Ct. 2. The Quirin Court also observed, consistent with Chief Justice Chase’s words nearly a century earlier, Milligan, 71 U.S. at 142 (Chase, C.J., concurring in judgment), that “[a]n important incident to the conduct of war is the adoption of measures by the military command ... to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war.” Quirin, 317 U.S. at 28-29, 63 S.Ct. 2 (emphasis added).
*57 To the extent Quiñn’s scope may be debatable, the Yamashita Court made plain that Quiñn does not limit the Congress’s power to codify law-of-war offenses to the Define and Punish Clause. Although it recognized Quiñn’s holding that the Define and Punish Clause provided the Congress with sufficient power to authorize the trial of the Nazi saboteurs by military commission, Yamashita, 327 U.S. at 7, 66 S.Ct. 340, the Yamashita Court reiterated that military-commission trials are “[a]n important incident to the conduct of war.” Id. at 11, 66 S.Ct. 340 (citing Qui-rin, 317 U.S. at 28,- 63 S.Ct. 2). The Court continued:
The trial and punishment of enemy combatants who have committed violations of the law of war is thus not only a part of the conduct of war operating as a preventive measure against such violations, but is an exercise of the authority sanctioned by Congress to administer the system of military justice recognized by the law of war. That sanction is without qualification as to the exercise of this authority so long as a state of war exists — from its declaration until peace is proclaimed. The war power, from which the commission derives its existence, is not limited to victories in the field, but carries with it the inherent power to guard against the immediate renewal of the conflict, and to remedy, at least in ways Congress has recognized, the evils which the military operations have produced.
Id. at 11-12, 66 S.Ct. 340 (emphases added) (citations omitted); see also Toth, 350 U.S. at 13-14 & n. 4, 76 S.Ct. 1 (describing Yamashita as holding about Congress’s war powers); Howard S. Fredman, Comment, The Offenses Clause: Congress’ International Penal Power, 8 Colum. J. Transnat’l L. 279, 303 (1969) (Yamashita “put the military prosecution of war criminals squarely within the war powers of Congress”).
Yamashita’s words are not mere rhetoric. To determine whether Yamashita had committed a war crime triable by military commission, the Supreme Court looked not only to international sources but also to the practice of “our own military tribunals” to conclude that Yamashita’s dereliction could be “penalized ” as a violation of the law of war. Yamashita, 327 U.S. at 16, 66 S.Ct. 340 (emphases added). In other words, the Yamashita Court cited domestic law to supplement, not merely “limit[ ],” the law of war. Cf. Maj. Op. 8. Justice Murphy, in dissent, likewise examined whether “the laws of war heretofore recognized by this nation ... impute[d] responsibility to a fallen commander for excesses committed by his disorganized troops while under attack.” Yamashita, 327 U.S. at 37, 66 S.Ct. 340 (Murphy, J., dissenting) (emphasis added). Thus, both the Yamashita majority and dissent agreed that, in the absence of international agreement that an offense constituted a violation of the law of war, “the principal offenses under the laws of war recognized by the United States ” could also constitute cognizable war crimes triable by military tribunal. Id. (emphasis added).
The shift from Quirin’s reliance on the Define and Punish Clause to Yamashita’s recognition that military-commission jurisdiction of law-of-war offenses — including law-of-war offenses denominated as such by the Congress- — derives from the broader war powers occurred in just four years, from 1942 to 1946. And it was that shift that led, six years later, to the Supreme Court’s conclusion that the “jurisdiction” of military commissions had traditionally been, and should be, “adapted in each instance to the need that called it forth.” Madsen, 343 U.S. at 347-48, 72 S.Ct. 699 (citing Yamashita, 327 U.S. at 18-23, 66 *58 S.Ct. 340). There can be no doubt that the war on terror, begun in response to the September 11, 2001 attacks, constitutes the next “need” to which the jurisdiction of law-of-war military tribunals must adapt. Id. Recognizing the adaptive nature of the Congress’s war powers, the Supreme Court has, in a variety of contexts, referred to the broad war powers of both political branches in conducting this ever-evolving war.[19]
I believe my colleagues have incautiously interfered with the reasoned decisions of the political branches based solely on Quinn, a case in which the Supreme Court affirmatively faded to draw the line they today draw. See 317 U.S. at 45-46, 63 S.Ct. 2. Because they apparently see Quinn as the alpha and omega of the Congress’s Article I war powers, they conclude that Bahlul’s conspiracy conviction cannot stand. But Yamashita belies their conclusion that Quiñn set the “contours” of law-of-war jurisdiction, Maj. Op. 7-8, that those contours are defined exclusively by express international agreement, Maj. Op. 10-11, and that “[t]he Supreme Court has adhered to Quiñn’s understanding of the meaning of the ‘law of war’ for over seventy years.” Maj. Op. 9.

b. Winthrop’s Treatise

As discussed, neither the plain text of the Congress’s Article I war powers nor Supreme Court precedent examining the contours of law-of-war military-commission jurisdiction supports the “clear conviction” needed to invalidate Bahlul’s conspiracy charge. Quirin, 317 U.S. at 25, 63 S.Ct. 2. Secondary authority also weighs against him. Almost one hundred years ago, Colonel William Winthrop, considered the “Blaekstone of Military Law,” Reid, 354 U.S. at 19 n. 38, 77 S.Ct. 1222 (plurality), authored the definitive treatise on these matters. In his chapter “Authority and Occasion for the Military Commission,” Winthrop made plain that, “in general, it is those provisions of the Constitution which empower Congress to ‘declare war’ and ‘raise armies,’ and which, in authorizing the initiation of war, authorize the employment of all necessary and proper agencies for its due prosecution, from which th[e military] tribunal derives its original sanction.” William WinthRop, MilitaRY Law & PRECEDENTS 831 (1920) (emphasis in original). According to Winthrop, a military tribunal “is simply an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-chief in war.” Id. (emphasis added).
Notwithstanding his reference to the “Law of War” as “intended [to refer to] that branch of International Law which *59 prescribes the rights and obligations of belligerents,” he further observed that the “Law of War in this country is not a formal written code, but consists mainly of general rules derived from International Law, supplemented by acts and orders of the military power and a few legislative provisions.” Id. at 773 (first emphasis in original). Winthrop, it appears, had no issue with Congressional “supplementation” of law-of-war offenses proscribed by international agreement. In his treatise, Winthrop listed[20] the “offences in violation of the laws and usages of war” and described them as “those principally, in the experience of our wars,” that have been “cognizable by military tribunals.” Win-thRop, supra, at 839 (emphasis added). The most natural reading of Winthrop’s-expertise — a reading also consistent with Article I’s multiple war powers and the Supreme Court’s analyses in both Yamashita, 327 U.S. at 11-12, 66 S.Ct. 340, and Madsen, 343 U.S. at 346-48, 72 S.Ct. 699— is that the Define and Punish Clause is one grant of power to the Congress to determine the law-of-war offenses triable by military commission but it is not the exclusive one.
c. Historical Practice
My colleagues note that our nation lacks “a long-standing historical practice” of conspiracy trial and conviction by military commission, dismissing it as “thin ... and equivocal at best.” Maj. Op. 11. There is no dispute that the “military commission ... was born of military necessity.” Hamdan, 548 U.S. at 590, 126 S.Ct. 2749. Fortuitously, military necessity has occurred only sporadically since the creation of the military commission. But what history exists demonstrates that, each time military necessity has resulted in subjecting war criminals to military court jurisdiction, conspiracy has been among the charges tried.
The majority takes issue with the example of the Lincoln conspirators, see William H. Rehnquist, All the Laws but One: Civil LibeRties in Wartime 144 (1998) (“Edwin Stanton personally directed the *60 investigation of Lincoln’s assassination and the pursuit of the conspirators.”); id. at 145 (“The administration ... decided to try the alleged conspirators before a military commission rather than in the civil courts”), concluding that the charging document “referred to conspiracy” but did not in fact charge conspiracy. Maj. Op. 12. According to the charging document, however, the Lincoln conspirators were charged with “combining, confederating, and conspiring together ... to kill and murder ... Abraham Lincoln.” J. Holt & T. Ewing, Chaege and Specification Against David E. Herold, et al. (1865) (emphasis added); see also Rehnquist, supra, at 143 (“Obviously, Booth had not acted alone in this enterprise, and the stage was now set for the trial of those who were charged with having conspired with him.” (emphasis added)). The circumstances surrounding the Lincoln assassination also make indisputable that the defendants could only have been charged with conspiracy. Because John Wilkes Booth was the lone assassin and was himself killed while a fugitive, the remaining eight necessarily could have been tried and convicted based solely on their conspiracy. One of those eight individuals — Mary Sur-ratt, who was hanged for her role — participated in the conspiracy by allowing the others to use her boarding house as a meeting place. See Rehnquist, supra, at 165. And two other Lincoln conspirators — Michael O’Laughlin and Samuel Arnold — could have been convicted only of inchoate conspiracy because, “[bjefore the final plot to assassinate Lincoln was hatched, O’Laughlin and Arnold appear to have abandoned the enterprise.” Id. at 162. Indeed, Arnold had apparently “told the others he wanted nothing more to do with the affair” one month before the assassination and, when Arnold withdrew, the remaining, conspirators planned to kidnap — not assassinate — Lincoln. Id. at 160. Nevertheless, both O’Laughlin and Arnold were'convicted and sentenced to life imprisonment at the conclusion of their military-commission trial. See id. at 162. Today, their withdrawal would have immunized 'them from the “postwithdrawal acts of [their] co-conspirators,” Smith v. United States, — U.S. -, 133 S.Ct. 714, 719, 184 L.Ed.2d 570 (2013), and they would not have been convicted of a completed offense. But abandonment without also preventing the object offense is not a defense to inchoate conspiracy. See Model Penal Code § 5.03(6).
My colleagues respond by describing the military commission that tried the Lincoln conspirators as “a mixed martial law and law of war military commission.” Maj. Op. 12. Its description, however, does not withstand scrutiny. True, at the time of the Lincoln conspirators’ trial, Washington, D.C., was under limited martial law. Nevertheless, the civilian courts remained open and operational. 11 U.S. Op. Atty. Gen. at 297 (“Martial law had been declared in the District of Columbia, but the civil courts were open and held their regular sessions, and transacted business as in times of peace.”). But because the military cannot exercise martial-law jurisdiction unless civilian courts are closed, Milligan, 71 U.S. at 127, the Lincoln conspirators’ military court necessarily was purely a military commission with law-of-war (including conspiracy) jurisdiction. See also Hamdan, 548 U.S. at 597, 126 S.Ct. 2749 (plurality) (noting that military courts have at times “substituted for civilian courts at times and in places where martial law has been declared” (emphasis added)).[21] My colleagues, 'then, *61 would retroactively undermine the constitutionality of at least two of the Lincoln conspirators’ convictions. Contra Bahlul, 767 F.3d at 25 (“the Lincoln conspirators’ trial [i]s a particularly significant precedent” because it “was a matter of paramount national importance and attracted intense public scrutiny”).
My colleagues’ attempt to distinguish Bahlul from the Nazi saboteurs in Quirin fares no better. Quirin marked the first time in our nation’s history that the Supreme Court addressed the jurisdiction of a law-of-war military commission. See Haridimos V. Thravalos, History, Hamdan, and Happenstance: “Conspiracy by Two or More to Violate the Laws of War by Destroying Life or Property in Aid of the Enemy”, 3 HaRV. Nat’l Sec. J. 223, 277 (2012) (referring to Quirin as “the first time in civil litigation” that “the Court explicitly recognized the existence of law-of-war jurisdiction enforceable through criminal proceedings conducted by pure law-of-war military commissions, a source of jurisdiction that had long been recognized by the practice of our own military authorities” (quotation marks omitted)). Before Quirin, the Executive Branch had provided most of the legal authority prescribing offenses cognizable as law-of-war offenses. See id. at 240-41. Although the Supreme Court did not reach the conspiracy charge in Quirin, the petitioners’ conspiracy convictions secured the imprimatur of President Roosevelt. Because the President heads “a coequal branch of government” and “take[s] the same oath we do to uphold the Constitution of the United States,” his judgment is entitled to deference. Rostker, 453 U.S. at 64, 101 S.Ct. 2646; see also United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (“In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others.”).
My colleagues also distinguish the conspiracy charges in Colepaugh v. Looney, 235 F.2d 429 (10th Cir.1956). See Maj. Op. 12-13. The Colepaugh petitioners, described as the “1944 Nazi Saboteurs,” were charged with nearly identical offenses to those of the Quirin petitioners, including conspiracy. See Colepaugh, 235 F.2d at 431; Thravalos, supra, at 241. As with the Quirin saboteurs, the Colepaugh petitioners’ convictions arrived at the court with the Executive Branch’s full sanction. In fact, their convictions were deemed lawful by (1) a special Board of Review in the Office of the Judge Advocate General of the Army, (2) the Judge Advocate General himself and (3) President Harry Truman, who “personally approved” their convictions. Thravalos, supra, at 241-42. The Tenth Circuit in Colepaugh affirmed “the charges and specifications before us.” 235 F.2d at 432 (emphasis added). My colleagues read Colepaugh as affirming only “the law of war acts of belligerency,” and *62 not “addressing the conspiracy charge.” Maj. Op. 13. But the Tenth Circuit put no such limitation on its holding. And even if it had, “[t]he U.S. Army continued to follow” Colepaugh “to try conspiracy in overseas theaters of war during the concluding months of World War II”[22] and to authorize trial of conspiracy by military commission during the Korean War.[23] Thravalos, supra, at 242-43.
Rather than meet this — to me — robust history, my colleagues instead take issue with the Government’s (admittedly) paltry submission. See Maj. Op. 10-13. But we are “called upon to judge the constitutionality of an Act of Congress — ‘the gravest and most delicate duty that this Court is called upon to perform,’ ” Rostker, 453 U.S. at 64, 101 S.Ct. 2646 (quoting Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (Holmes, J.)), and I, accordingly, take issue with — and indeed reject — my colleagues’ languid dismissal of the Government’s submission without more.
In sum, I would hold that Bahlul has not carried his burden of establishing— “clear[lyj” or otherwise — that his military trial and conviction are unconstitutional. Quirin, 317 U.S. at 25, 63 S.Ct. 2. The Congress has ample authority under the Define and Punish Clause — especially when supplemented by the Necessary and Proper Clause and the broader war powers and supported by judicial precedent, Winthrop’s treatise and history — to authorize a military-commission trial charging conspiracy to commit war crimes.
Before moving to Article III, one final point is in order. Both of my colleagues contend that, unless we stringently police the Congress’s Article I powers, the Government will possess “virtually unlimited authority” to try enemy combatants by military commission. Concur. Op. 26; see also Maj. Op. 16-17. Yet, when it comes to issues of national security and foreign affairs, abstention — not aggressive policing — has always been our watchword. See Egan, 484 U.S. at 530, 108 S.Ct. 818; La-tif, 677 F.3d at 1182. In addition, several limitations on military commissions remain, including the other jurisdictional requirements identified by Winthrop, see Hamdan, 548 U.S. at 597-98, 126 S.Ct. 2749 (plurality) (citing WinthRop, supra, at 836-39); the Bill of Rights (for U.S. citizens); and — at the very least — the existence of an ongoing war, see Yamashita, 327 U.S. at 11-13, 66 S.Ct. 340. This last requirement should not be minimized. We would be wise to remember that, in a democracy like ours, not every question calls for a judicial answer. See Mo., K. & T. Ry. Co. of Tex. v. May, 194 U.S. 267, 270, 24 S.Ct. 638, 48 L.Ed. 971 (1904) (“[í]t must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.”); Al-Bihani v. Obama, 619 F.3d 1, 11-12 (D.C.Cir.2010) (Ka- *63 vanaugh, J., concurring in denial of rehearing en banc) (discussing potential “serious consequences, such as subjecting the United States to sanctions, undermining U.S. standing in the world community, or encouraging retaliation against U.S. person-, nel abroad” should political branches “ignore or disregard international-law norms” but nonetheless maintaining that “in our constitutional system of separated powers, it is for Congress and the President — not the courts — to determine in the first instance whether and how the United States will meet its international obligations”).
B. Article III
The heart of Bahlul’s appeal is his claim that the Congress violated Article III when it made conspiracy triable by military commission. In my view, Bahlul invokes two separate provisions of Article III: the Judicial Power Clause, U.S. Const, art. Ill, § 1, and the Criminal Jury Clause, id. § 2, cl. 3. I analyze both arguments below.
1. Judicial Power Clause
The Judicial Power Clause of Article III provides:
The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish....
U.S. Const, art. Ill, § 1. The Clause mirrors similar grants of power to the Congress in Article I and to the President in Article II. See id. art. I, § 1 (“All legislative Powers herein granted shall be vested in a Congress .... ”); id. art. II, § 1, cl. 1 (“The executive Power shall be vested in a President....”). Together, the Vesting Clauses erect “walls” that separate the three branches, Plant, 514 U.S. at 239, 115 S.Ct. 1447, and prevent them from “sharing]” their respective powers, Nixon, 418 U.S. at 704, 94 S.Ct. 3090. The walls, however, are not “hermetically sealed,” Stem, 131 S.Ct. at 2609, and they must bend a little to ensure we remain “a Nation capable of governing itself effectively,” Buckley v. Valeo, 424 U.S. 1, 121, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). See also Mistretta v. United States, 488 U.S. 361, 381, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (“While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government.”) (quoting Youngstown, 343 U.S. at 635, 72 S.Ct. 863 (Jackson, J., concurring)); Mo., K. & T. Ry., 194 U.S. at 270, 24 S.Ct. 638 (“Some play must be allowed for the joints of the machine....”).
Section 1 of Article III vests the “judicial Power” in the federal courts, whose judges enjoy life tenure and fixed salaries. See U.S. Const, art. Ill, § 1. The “judicial Power,” as relevant here, extends to “Cases ... arising under ... the Laws of the United States.” Id. § 2, cl. 1. Axiomatically, these provisions require Article III cases to be adjudicated by Article III judges in Article III courts. See Stem, 131 S.Ct. at 2608-09. And they restrain the Congress’s authority to assign the judicial power to federal tribunals lacking the insulating protections of Article III. See id.
Despite this analytic simplicity, however, “the literal command of Art. Ill ... must be interpreted in light of the historical context in which the Constitution was written, and of the structural - imperatives of the Constitution as a whole.” N. Pipeline, 458 U.S. at 64, 102 S.Ct. 2858 (plurality); see also id. at 94, 102 S.Ct. 2858 (White, J., dissenting) (“[A]t this point in the history of constitutional law th[e Article III] question can no longer be answered by looking only to the constitutional text.”). The Supreme Court has recognized several his *64 torical — albeit atextual — “exception[s]” to the Judicial Power Clause. See id. at 63-76, 102 S.Ct. 2858 (plurality). The deviations are justified by longstanding historical practice and “exceptional constitutional grants of power to Congress” over particular subject matters. Id. at 70 & n. 25, 102 S.Ct. 2858.
The military commission is one such exception. See Eisentrager, 339 U.S. at 785-90, 70 S.Ct. 936; Quirin, 317 U.S. at 39-41, 63 S.Ct. 2; Ex parte Vallandigham, 68 U.S. 243, 251-53, 1 Wall. 243, 17 L.Ed. 589 (1863). Like courts martial and occupational courts, the constitutionality of the law-of-war military commission is “well-established.” Eisentrager, 339 U.S. at 786, 70 S.Ct. 936. Military tribunals predate the ratification of our Constitution and were used — without constitutional incident — during the Revolutionary, Mexican — American and Civil Wars. See Madsen, 343 U.S. at 346 & nn. 8-9, 72 S.Ct. 699; Quirin, 317 U.S. at 31 & nn. 9-10, 63 S.Ct. 2. Moreover, the Constitution vests broad war powers in the Congress, Eisen-trager, 339 U.S. at 788, 70 S.Ct. 936, and military-commission trials are part of waging war. See Yamashita, 327 U.S. at 11-12, 66 S.Ct. 340. Accordingly, placing the military commission outside the confines of Article III is “consistent with, rather than threatening to, the constitutional mandate of separation of powers.” N. Pipeline, 458 U.S. at 64, 102 S.Ct. 2858 (plurality); see also Maqaleh v. Hagel, 738 F.3d 312, 334 (D.C.Cir.2013) (“The prosecution of our wars is committed uniquely to the political branches.... ”).
As discussed earlier, supra Part II.A, the Congress acted well within its Article I powers when it made conspiracy triable by military commission. The challenged provision therefore falls within a historical exception to the Judicial Power Clause. The Supreme Court said it well more than 150 years ago:
Congress has the power to provide for the trial and punishment of military and naval offences in the manner then and now practiced by civilized nations; and ... the power to do so is given without any connection between it and the 3d article of the Constitution defining the judicial power of the United States; indeed, ... the two powers are entirely independent of each other.
Dynes v. Hoover, 61 U.S. 65, 79, 20 How. 65, 15 L.Ed. 838 (1857) (emphases added). For this reason alone, Bahlul’s Article III challenge should fail.
My colleagues suggest that, because inchoate conspiracy is not an expressly recognized international law-of-war offense, the challenged provision falls outside the historical safe harbor for military-commission jurisdiction and therefore violates Article III. See Maj. Op. 18-19; Concur. Op. 24. But this syllogism is faulty, even under their crabbed view of the Congress’s Article I authority. A statute does not automatically violate the Judicial Power Clause simply because it falls outside a historical exception to Article III. See Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 587, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (“[Practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III.”); Schor, 478 U.S. at 851, 106 S.Ct. 3245 (“Although [formalistic and unbending] rules might lend a greater degree of coherence to this area of the law, they might .also unduly constrict Congress’ ability to take needed and innovative action pursuant to its Article I powers.”). Instead, we apply the general standard for Judicial Power Clause challenges: the Schor balancing test. See Schor, 478 U.S. at 851, 106 S.Ct. 3245 (announcing “practical” test for *65 courts to apply “in reviewing Article III challenges”). Criminal cases are not exempt from this framework. See United States v. Seals, 130 F.3d 451, 459 n. 8 (D.C.Cir.1997) (“While Schor addressed ... a state-law counterclaim in an administrative reparation proceeding, there is no reason that the structural constitutional analysis should be any different in the criminal context.” (citing Mistretta, 488 U.S. at 382-83, 109 S.Ct. 647)). And they do not enjoy any special significance under Article III. As the Supreme Court has explained:
It was neither the legislative nor judicial view ... that trial and decision of all federal questions were reserved for Art. Ill judges. Nor, more particularly has the enforcement of federal criminal law been deemed the exclusive province of federal Art. Ill courts. Very early in our history, Congress left the enforcement of selected federal criminal laws to state courts and to state court judges who did not enjoy the protections prescribed for federal judges in Art. III.
Palmore v. United States, 411 U.S. 389, 402, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); see also id. at 407, 93 S.Ct. 1670 (“neither this Court nor Congress has read the Constitution as requiring ... every criminal prosecution for violating an Act of Congress!] to be tried in an Art. Ill court”).
The Supreme Court’s decision in Stern v. Marshall does not alter the analysis. There, the Supreme Court held that the Congress could not constitutionally authorize the bankruptcy courts to hear a debt- or’s compulsory state-law counterclaim. See 131 S.Ct. at 2620. The Stem Court emphasized that its holding was “narrow” and “isolated.” Id.; see also Sharif, 135 S.Ct. at 1946 (“An expansive reading of Stem ... would be inconsistent with the opinion’s own description of its holding.”). Its decision followed quite naturally from Northern Pipeline — another bankruptcy case. See 131 S.Ct. at 2615 (“Northern Pipeline ... directly covers this case.”). Despite the dissent’s concern that the majority had not faithfully applied the balancing approach from earlier cases, including Schor, see Stem, 131 S.Ct. at 2622 (Breyer, J., dissenting), the Stem Court did not overrule, or even call into question, those precedents. See id. at 2615. In fact, the Court faithfully applied Schor’s multi-factor balancing approach. See id. at 2614-19; see also id. at 2621 (Scalia, J., concurring) (“I count at least seven different reasons given in the Court’s opinion for concluding that an Article III judge was required to adjudicate this lawsuit.”). Indeed, Sharif — the Supreme Court’s latest pronouncement on the Judicial Power Clause — confirmed that the Schor balancing test remains the correct one. See Sharif, 135 S.Ct. at 1944-46.
My colleagues suggest, however, that the proper allocation of power between the Congress and the Judiciary turns on the latter’s interpretation of international law. See Maj. Op. 7-10; Concur. Op. 24-26. This approach is troubling enough under Article I; but the notion that international law dictates the operation of the separation of powers under our Constitution is outlandish. Indeed, the notion “runs counter to the democratic accountability and federal structure envisioned by our Constitution.” Hon. J. Harvie Wilkinson III, The Use of International Law in Judicial Decisions, 27 HaRV. J.L. & Pub. Pol’y 423; 429 (2004). Instead, if the challenged provision falls outside a historical exception to Article III, we must still assess it under Schor. Schor’s balancing test is the only one that considers factors that are relevant to the separation-of-powers concerns underlying the Judicial Power Clause. We should look to separation-of-powers interests to decide separation-of-powers questions.
*66 Applying the Schor balancing test here, I believe the challenged provision does not violate the Judicial Power Clause. Granted, on one side of the Schor balance, a military trial for conspiracy implicates “private,” as opposed to public, rights. See HaRt & WeohsleR’s the FedeRal Courts & the Federal System 336 (6th ed.2009) (noting criminal cases are private rights cases under Schor). This observation “does not end our inquiry,” Schor, 478 U.S. at 853, 106 S.Ct. 3245, but it means our review must be “searching.” Id. at 854, 106 S.Ct. 3245. Further, military commissions exercise many, but not all, of the “ordinary powers of district courts.” N. Pipeline, 458 U.S. at 85, 102 S.Ct. 2858 (plurality). But see Sharif, 135 S.Ct. at 1944 n. 9 (non-Article III tribunal’s power to enter final judgment is relevant but not decisive).
It is unclear whether Bahlul “consented” to trial by military commission. Although he resisted being tried at all, he never raised an Article III objection to the military commission. Compare Sharif, 135 S.Ct. at 1948 (“[T]he key inquiry is whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator.” (emphasis added) (quotation marks omitted)), with id. at 1947 (“[T]he cases in which this Court has found a violation o.f a litigant’s right to an Article III decisionmaker have involved an objecting defendant forced to litigate involuntarily before a non-Article III court.” (emphasis added)), and United States v. Underwood, 597 F.3d 661, 669-73 (5th Cir.2010) (in criminal case, failure to raise Article III objection can constitute implied consent). In my view, “consent” from an enemy combatant like Bahlul does not meaningfully tip the scales one way or the other. .
On the other side of the balance, several factors indicate that conspiracy to commit war crimes can be constitutionally tried by military commission. First, and most importantly, the Congress has subjected the military commission to judicial review. The 2009 MCA, like its 2006 predecessor,[24] allows the enemy combatants held at Guantanamo Bay, Cuba, to appeal their convictions to this Court, 10 U.S.C. § 950g, after intermediate review by the CMCR, id. § 950f. We then review de novo all “matters of law” that an enemy combatant preserves for appeal, id. § 950g(d), with the opportunity of certiorari review by the Supreme Court, id. § 950g(e). This safeguard “provides for the appropriate exercise of the judicial function in this class of cases” and keeps the military commission within the bounds of law. Crowell v. Benson, 285 U.S. 22, 54, 52 S.Ct. 285, 76 L.Ed. 598 (1932). As the Supreme Court has repeatedly recognized, the availability of de novo review of questions of law by an Article III court substantially allays any Judicial Power Clause concerns with a given statutory arrangement. See Schor, 478 U.S. at 853, 106 S.Ct. 3245; Union Carbide, 473 U.S. at 592, 105 S.Ct. 3325; Crowell, 285 U.S. at 54, 52 S.Ct. 285; see also N. Pipeline, 458 U.S. at 115, 102 S.Ct. 2858 (White, J., dissenting) (“the presence of, appellate review by an Art. Ill court will go a long way toward insuring a proper separation of powers”). Granted, we review the military commission’s verdict— i.e., its findings of fact — only for “sufficiency of the evidence.” 10 U.S.C. § 950g(d). But, contrary to my colleagues’ assertion, Maj. Op. 20-21, Article III requires very *67 little — perhaps zero — -judicial review of ordinary questions of fact. See Crowell, 285 U.S. at 51, 52 S.Ct. 285 (“[I]n [private rights] cases ..., there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges.”); The Francis Wright, 105 U.S. 381, 386, 26 L.Ed. 1100 (1881) (Congress has “power to limit the effect of an appeal to a review of the law as applicable to facts finally determined below”). The deferential review provided by the 2009 MCA thus goes beyond the constitutional minimum. See, e.g., Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 90 L.Ed. 567 (1946) (upholding “no basis in fact” standard for jurisdictional facts and zero review for ordinary facts in criminal case); Union Carbide, 473 U.S. at 592-93, 105 S.Ct. 3325 (review for “fraud, misconduct, or misrepresentation” satisfies Article III); Schor, 478 U.S. at 853, 106 S.Ct. 3245 (review for “weight of the evidence” satisfies Article III); Cro-well, 285 U.S. at 48, 52 S.Ct. 285 (“not supported by evidence” standard satisfies Article III); see also Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (“sufficiency of the evidence” standard satisfies due-process requirements for criminal cases).
Second, the military commission has very limited jurisdiction under the 2006 MCA. It “deals only with a particularized area of law” — namely, the law of war. Schor, 478 U.S. at 852, 106 S.Ct. 3245 (quotation marks omitted). The 2006 MCA enumerates, in total, 30 war crimes, 10 U.S.C. §§ 950r, 950u-950v (2006), and only an “alien unlawful enemy combatant” is subject to military-commission trial, id. § 948c. No one disputes that military commissions can — consistent with Article III — adjudicate expressly recognized international law-of-war offenses. An inchoate offense like conspiracy adds only a “narrow class of ... claims ... incident to the [military commission’s] primary, and unchallenged, adjudicative function.” Sharif, 135 S.Ct. at 1945. This is not a case in which the Congress “created a phalanx of non-Article III tribunals equipped to handle the entire business of the Article III courts.” Schor, 478 U.S. at 855,106 S.Ct. 3245. Nor does the commission possess unbounded jurisdiction “reaching any area of the corpus juris.” Stem, 131 S.Ct. at 2615. Here, “the magnitude of any intrusion on the Judicial Branch can only be termed de minimis.” Schor, 478 U.S. at 856, 106 S.Ct. 3245.
Third, “the concerns that drove Congress to depart from the requirements of Article III” tilt in favor of the challenged provision’s constitutionality. Id. at 851, 106 S.Ct. 3245. The Congress chose the military commission over Article III court for one overriding reason: national security. Among the discussed concerns were the potential disclosure of highly classified information[25]; the efficiency of military-commission proceedings[26]; the military’s expertise in matters of national security[27]; *68 the inability to prosecute enemy combatants due to speedy-trial violations[28]; the inadmissibility of certain forms of evidence[29]; and, later, the risk of terrorist attacks on domestic courts.[30] Unlike my concurring colleague, who believes that Article III courts are well-suited to try conspirators like Bahlul, see Concur. Op. 26-27. I would defer to the choice' made by the Congress — an institution with real-world expertise in this area that has rejected a one-size-fits-all choice of forum. In any event, the Congress’s concerns are plainly legitimate; indeed, “no governmental interest is more compelling than the security of the Nation.” Haig v. Agee, 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981). And these legitimate interests demonstrate without question that the Congress did not “transfer jurisdiction to [a] non-Article III tribunal ] for the purpose of emasculating constitutional courts.” Schor, 478 U.S. at 850, 106 S.Ct. 3245 (emphasis added) (alterations and quotation marks omitted).
Finally, the system that the Congress has established — military-commission proceedings in the Executive Branch, appellate review in the Judicial Branch — “raises no question of the aggrandizement of congressional power at the expense of a coordinate branch.” Schor, 478 U.S. at 856, 106 S.Ct. 3245. As the Supreme Court explained in Mistretta, “encroachment and aggrandizement” are the hallmarks of cases in which the Court has invalidated a congressional statute for violating the separation of powers. 488 U.S. at 382, 109 S.Ct. 647. “By the same token,” the Supreme Court has “upheld statutory provisions that to some degree commingle the functions of the Branches, but that pose no danger of either aggrandizement or encroachment.” Id. (citing, as examples, Morrison v. Olson, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) and Schor, 478 U.S. 833, 106 S.Ct. 3245). In the 2006 MCA, the Congress has assigned conspiracy to the military for trial and sentencing and to the Judiciary for review “without appreciable expansion of its own power,” Schor, 478 U.S. at 856-57, 106 S.Ct. 3245, and while “retaining] for itself no powers of control or supervision,” Morrison, 487 U.S. at 694,108 S.Ct. 2597. This is not the sort of legislation that raises separation-of-powers hackles.
Notably, the Supreme Court has found a violation of the Judicial Power Clause in only two cases — both involving bankruptcy courts. See Stem, 131 S.Ct. at 2620; Northern Pipeline, 458 U.S. at 87, 102 S.Ct. 2858 (plurality). Outside the bankruptcy context, however, the Court has repeatedly upheld congressional statutes against such attacks. See, e.g., Mistretta, 488 U.S. at 393-97, 109 S.Ct. 647 (U.S. Sentencing Commission); Schor, 478 U.S. at 851-58, 106 S.Ct. 3245 (CFTC); Union Carbide, 473 U.S. at 582-93,105 S.Ct. 3325 *69 (mandatory arbitration); Palmore, 411 U.S. at 407-10, 93 S.Ct. 1670 (District of Columbia courts); Williams v. United States, 289 U.S. 553, 568-81, 53 S.Ct. 751, 77 L.Ed. 1372 (1933) (Court of Claims); Crowell, 285 U.S. at 48-65, 52 S.Ct. 285 (workmen’s compensation board); Ex parte Bakelite Corp., 279 U.S. 438, 452-61, 49 S.Ct. 411, 73 L.Ed. 789 (1929) (Court of Customs Appeals); Dynes, 61 U.S. at 79, 61 U.S. 65 (courts martial); Am. Ins. Co. v. 356 Bales of Cotton, 26 U.S. 511, 546, 1 Pet. 511, 7 L.Ed. 242 (1828) (territorial courts). The bankruptcy cases are an anomaly in this area of the law and I do not believe they provide a relevant analog. Military commissions are a recognized exception to Article III whereas bankruptcy courts are not. See N. Pipeline, 458 U.S. at 71,102 S.Ct. 2858 (plurality) (Congress’s bankruptcy power is not “exceptional grant of power” subject to Article III exception); Stem, 131 S.Ct. at 2614 (bankruptcy courts do not fall under “public rights” exception to Article III). This case, then, is much easier than Stem and Northern Pipeline: the historical exceptions to Article III are exceptions not because they are close to the constitutional line but because they are far from it. See Dynes, 61 U.S. at 79. Historically, courts martial and military commissions are thought to pose no Article III problem, notwithstanding they are subject to little judicial review. See 28 U.S.C. § 1259; Burns v. Wilson, 346 U.S. 137, 140-41, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (plurality); Vallandigham, 68 U.S. at 252-53. The availability of de novo appellate review under the 2009 MCA keeps the challenged provision in the constitutional fold, even if, arguendo, inchoate conspiracy were to venture beyond the historical Article III exception for military-commission jurisdiction.
For these reasons, I believe the challenged provision satisfies the Schor balancing test. Moreover, irrespective of Schor, the statute falls comfortably within the Congress’s Article I authority and, concomitantly, under the military-commission exception to Article III. Bahlul’s Judicial Power Clause challenge therefore fails.
2. Criminal Jury Clause
In addition to ensuring the separation of powers, Article III also protects individual rights. The Criminal Jury Clause broadly requires that “[t]he Trial of all Crimes ... shall be by Jury ... in the State where the said Crimes shall have been committed” or where the “Congress may by Law have directed.” U.S. Const, art. Ill, § 2, cl. 3. Like the Sixth Amendment, the Criminal Jury Clause preserves the right to a jury only as it existed at common law. Quirin, 317 U.S. at 39, 63 S.Ct. 2 (“[I]t was not the purpose or effect of § 2 of Article III, read in the light of the common law, to enlarge the then existing right to a jury trial.”).
Bahlul — an enemy combatant tried by military commission — has no right to a jury. At common law, “trial by a jury” was a “familiar part[ ] of the machinery for criminal trials in the civil courts.” Id. But it was “unknown to military tribunals, which are not courts in the sense of the Judiciary Article, and which in the natural course of events are usually called upon to function under conditions precluding resort to such procedures.” Id. (citations omitted). For example, the Continental Congress passed a resolution ordering the trial of alien spies in military courts without a jury. See id. at 41, 63 S.Ct. 2 (citing Resolution of the Continental Congress of Aug. 21, 1776, 5 J. Cont’l Cong. 693). The resolution — a “contemporary construction” of the Constitution “entitled to the greatest respect” — manifests that the Founders did not see juries as a limitation on military-commission trials. Id. at 41-42, 63 S.Ct. 2; see also Kahn v. Anderson, 255 *70 U.S. 1, 8, 41 S.Ct. 224, 65 L.Ed. 469 (1921) (rejecting idea that military courts must use jury because it would “directly d'en[y] the existence of a power [that] Congress exerted from the beginning”). Moreover, members of our own military are tried by court martial without a jury; thus, the Constitution plainly presents “no greater obstacle” to trying enemy combatants by military commission. Quirin, 317 U.S. at 44, 63 S.Ct. 2; see also Whelchel v. McDonald, 340 U.S. 122, 127, 71 S.Ct. 146, 95 L.Ed. 141 (1950) (“The right to trial by jury guaranteed by the Sixth Amendment is not applicable to trials by courts-martial or military commissions.”); Sanford v. United States, 586 F.3d 28, 35 (D.C.Cir.2009) (“[T]he Sixth Amendment right to a criminal jury trial does not, itself, apply to the military.”). As discussed earlier, supra Part II.A, the Congress has the Article I authority to require Bahlul to be tried by military commission. He therefore has no right to a jury. See Quirin, 317 U.S. at 40, 63 S.Ct. 2 (“[section] 2 of Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission”); id. at 41, 63 S.Ct. 2 (“trials before military commissions ... are ... no[t] within the provisions of Article III, § 2”); accord Colepaugh, 235 F.2d at 433 (“Quirin ... removes any doubt of the inapplicability of the Fifth or Sixth Amendments to trials before military commissions.”).
Bahlul contends, however, that the Criminal Jury Clause, like the Judicial Power Clause, is a structural limitation on military-commission jurisdiction. Specifically, he believes — and my colleagues at one point appear to agree, see Maj. Op. 9 — that a military commission has no jurisdiction of offenses triable by jury at common law. Bahlul is mistaken. The right to a jury is not a “structural” constraint but an individual right that can be both forfeited and waived. Johnson, 520 U.S. 461, 465-66, 117 S.Ct. 1544 (1997); see also B & B Hardware, 135 S.Ct. at 1304 (jury-trial right “does not strip competent tribunals of the power to issue judgments,” no matter “the nature of the competent tribunal”); Gosa v. Mayden, 413 U.S. 665, 677, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973) (plurality) (denial of jury-trial right does not deprive military tribunal of jurisdiction or render its judgments void). Even Schor recognized this difference:
[A]s a personal right, Article Ill’s guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried. See, e.g., Duncan v. Louisiana, 391 U.S. 145, 158, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (waiver of right to trial by jury in criminal case).
478 U.S. at 848-49, 106 S.Ct. 3245 (some citations omitted). The right to a jury— regardless of its location in Article III — is no more a structural limitation on military-commission jurisdiction than are the myriad personal safeguards in the Bill of Rights. Cf Seals, 130 F.3d at 456 n. 3 (“constitutional safeguards associated with Article III supervision of federally-indicting grand juries ... implieate[ ] personal, not structural, constitutional rights” (citations omitted)).
The Supreme Court’s Seventh Amendment jurisprudence makes doubly clear that the right to a jury is not an independent constraint on the Congress’s authority to use non-Article III tribunals. In Granfinanciera, the petitioners argued that their Seventh Amendment right to a civil jury prevented the Congress from assigning certain claims to the bankruptcy courts. See 492 U.S. at 36-37, 109 S.Ct. 2782. According to the Court, whether *71 the petitioners had a right to trial by jury “requires the same answer as the question whether Article III allows Congress to assign adjudication ... to a non-Article III tribunal.” Id. at 53, 109 S.Ct. 2782 (emphasis added). In other words, the Judicial Power Clause — not the Seventh Amendment — is the only structural limit on the Congress’s authority. “[I]f Congress may assign the adjudication ... to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action by a nonju-ry factfinder.” Id. at 53-54,109 S.Ct. 2782 (emphasis added). The same is true here. As noted, supra Part II.B.l, the Judicial Power Clause allows the Congress to authorize the trial of conspiracy by military commission. Accordingly, Bahlul has no right to a jury and the Criminal Jury Clause poses “no independent bar” to his conviction. Id. at 54, 109 S.Ct. 2782.[31]
Even if the Criminal Jury Clause did limit military-commission jurisdiction, it has no application here because Bahlul is neither a U.S. citizen nor present on U.S. soil. The Supreme Court has repeatedly held that the Constitution offers no protection to noncitizens outside the United States. See, e.g., Eisentrager, 339 U.S. at 784-85, 70 S.Ct. 936; United States v. Verdugo-Urquidez, 494 U.S. 259, 273-75, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990); Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); Kwong Hai Chew v. Colding, 344 U.S. 590, 597 n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953); United States v. Belmont, 301 U.S. 324, 332, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318, 57 S.Ct. 216, 81 L.Ed. 255 (1936). This limitation on the Constitution’s extraterritorial reach encompasses the right to a jury trial in a criminal case. See, e.g., Eisentrager, 339 U.S. at 784-85, 70 S.Ct. 936; Balzac v. Porto Rico, 258 U.S. 298, 304-05, 42 S.Ct. 343, 66 L.Ed. 627 (1922); Dorr v. United States, 195 U.S. 138, 149, 24 S.Ct. 808, 49 L.Ed. 128 (1904); Territory of Hawaii v. Mankichi, 190 U.S. 197, 218, 23 S.Ct. 787, 47 L.Ed. 1016 (1903). Granted, in Reid v. Covert, a plurality of the Supreme Court agreed that the right to a jury extends to U.S. citizens abroad. See 354 U.S. at 7, 77 S.Ct. 1222. But “[s]ince [Bahlul] is not a United States citizen, he can derive no comfort from the Reid holding.” Verdugo-Urquidez, 494 U.S. at 270, 110 S.Ct. 1056. The cases Bahlul relies on to support his jury-right argument suffer from the same fatal flaw: all involved U.S. citizens. See Reid, 354 U.S. at 3, 77 S.Ct. 1222 (citizen wives of U.S. soldiers); Toth, 350 U.S. at 13, 76 S.Ct. 1 (U.S. soldier); Quirin, 317 U.S. at 20, 63 S.Ct. 2 (Nazi saboteur with U.S. citizenship through his parents); Milligan, 71 U.S. at 107 (U.S. citizen living in Indiana).
In Boumediene v. Bush, the Supreme Court held “only” that the Suspension Clause protects enemy combatants held at Guantanamo Bay. 553 U.S. 723, 795, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). This Court has declined to extend Boumediene beyond its narrow holding. See Maqaleh, 738 F.3d at 336 n. 16 (“As a novel constitutional development, we are loath to expand Boumediene’s reach without specific guidance from the Supreme Court, particularly where expansion would carry us further into the realm of war and foreign policy.”); Kiyemba v. Obama, 555 F.3d 1022, 1032 (D.C.Cir.2009) (“Boumediene ... specifically limited its holding to the Suspension Clause”). And we lack the authority to *72 read Boumediene as overruling sub silen-tio Supreme Court precedent on the nonavailability of jury rights to noncitizens abroad. See Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (“If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.”).
Bahlul has no constitutional right to a jury and neither the Criminal Jury Clause nor the Judicial Power Clause of Article III can invalidate his conspiracy conviction.
C. Equal Pkotection & First Amendment
Bahlul’s two remaining challenges are frivolous. He contends that the 2006 MCA violates the equal protection component of the Fifth Amendment Due Process Clause because it applies only to aliens, not U.S. citizens, and that he was convicted because of his speech in violation of the First Amendment. Two of my colleagues have already considered these arguments and rejected them. See Bahlul, 767 F.3d at 62 (Brown, J., concurring/dissenting); id. at 75-76 (Kavanaugh, J., concurring/dissenting). I fully endorse their reasoning.
For the foregoing reasons, I respectfully dissent.

. Most of Bahlul's arguments involve personal constitutional rights that are indisputably forfeitable. See Peretz v. United States, 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) ("[t]he most basic rights of criminal defendants” can be forfeited); Yakus v. United States, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited....”); see also, e.g., Johnson v. United States, 520 U.S. 461, 466, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (right to petit jury); United States v. Broxton, 926 F.2d 1180, 1183 (D.C.Cir.1991) (equal protection); United States v. Accardi, 669 F.3d 340, 343-44 (D.C.Cir.2012) (First Amendment).

. Nguyen v. United States, 539 U.S. 69, 123 S.Ct. 2130, 156 L.Ed.2d 64 (2003), and Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (plurality), are not *31 to the contrary. In both cases, the criminal defendants complained that a non-Article III judge sat by designation on the court that reviewed or issued their respective convictions. Nguyen, 539 U.S. at 72, 123 S.Ct. 2130 (chief judge of District Court for Northern Mariana Islands); Glidden, 370 U.S. at 532, 82 S.Ct. 1459 (retired judge of Court of Customs and Patent Appeals). Although the defendants failed to timely raise their objections, the Supreme Court nevertheless declined to apply the plain-error standard. Nguyen, 539 U.S. at 80-81, 123 S.Ct. 2130; Glidden, 370 U.S. at 535-36, 82 S.Ct. 1459. Both Nguyen and Glidden, however, fit comfortably within the “jurisdictional” exception to plain-error review. In Glidden, the plurality declared that it was "treating] the alleged defect as 'jurisdictional.' ” 370 U.S. at 536, 82 S.Ct. 1459. And in Nguyen, the Court repeatedly described the alleged error as a challenge to the court's "authority.” 539 U.S. at 79-80, 123 S.Ct. 2130; see also Rivera v. Illinois, 556 U.S. 148, 161, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009) (unanimous) (describing Nguyen as case where court of appeals "lacked statutory authority to adjudicate the controversy” (emphasis added)).

. My colleagues note that the Government "conceded” their reading of Schor is correct. Maj. Op. 5. I do not take them to be saying, however, that the Government waived its plain-error argument. On the contrary, the Government "argued for plain-error review before the [United States Court of Military Commission Review (CMCR) ], in its original brief to a panel of this Court and in’its brief to the en banc court.” Bahlul, 767 F.3d at 10 n. 5. The Government again asked us to review Bahlul’s Article III challenge for plain error. See Resp't’s Br. 49-52, 60. And, even at oral argument, the Government objected to the notion that Bahlul was raising a nonforfeitable structural challenge — hardly a concession of the point. See Oral Arg. Recording 30:47 ("I do not acknowledge that he [Bahlul] was raising it [the structural Article III argument].”).
In any event, to .the extent the Government misinterprets Schor, I would decline to accept its- interpretation. See Young v. United States, 315 U.S. 257, 259, 62 S.Ct. 510, 86 L.Ed. 832 (1942) ("The proper administration of the *33 criminal law cannot be left merely to the stipulation of parties.”). The Government cannot alter our standard of review — by concession, inadvertence, poor oral advocacy or otherwise. See United States v. Delgado-Garda, 374 F.3d 1337, 1341 (D.C.Cir.2004) (declining to accept Government's concession that issue was jurisdictional and thus subject to de novo review); Nued-Pena, 711 F.3d at 196 n. 5 (declining to accept Government’s concession that constitutional challenge should be reviewed de novo, rather than for plain error); United States v. Vontsteen, 950 F.2d 1086, 1091 (5th Cir.1992) (‘‘[N]o party has the power to control our standard of review." (emphasis in original)).

. My colleagues also cite Stern v. Marshall, - U.S. -, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), to support their reading of Schor. Maj. Op. 5. But Stem said nothing about the forfeitability of Judicial Power Clause challenges. In Stem, the Supreme Court reviewed de novo the respondent’s Judicial Power Clause challenge to the bankruptcy court's adjudication of a state-law counterclaim. See id. at 2608. There is no indication, however, that the respondent ever forfeited this argument. Although he did forfeit his challenge to the bankruptcy court's adjudication of his defamation claim, id. at 2606, he “did not truly consent to” its adjudication of the petitioner’s tortious-interference counterclaim, id. at 2614. And, in fact, the respondent had earlier objected to the bankruptcy court’s jurisdiction of the counterclaim. See id. at 2601-02.

. My colleagues emphasize that in Sharif the Supreme Court reviewed the Article III question de novo. Maj. Op. 5, 6. This is true but unhelpful to them. The Supreme Court granted certiorari in Sharif to determine whether a party’s consent cures the structural Article III problem posed by bankruptcy court adjudication — a question that was decided by the Seventh Circuit and briefed in the Supreme Court. The Court answered the question in the affirmative. It then remanded to the Seventh Circuit to determine whether Sharif in fact consented to bankruptcy court adjudication and — if not — whether Sharif nonetheless forfeited his Judicial Power Clause challenge by not timely raising it. See 135 S.Ct. at 1948-49; Pet’r’s Wellness Int’l, et al. Br. 47-48, 2014 WL 4467356 (U.S.2014) (arguing that “litigants may waive or forfeit constitutional rights that implicate structural concerns’’); Pet'r’s Wellness Int’l, et al. Reply Br. 26, 2014 WL 7272803 (U.S.2014) (again arguing that “Sharif forfeited his Stem argument’’ (quotation marks and brackets omitted)). In other words, the Supreme Court answered an important question of law de novo but still allowed for the prospect that Sharif would ultimately lose his appeal because he forfeited his structural Article III challenge. My colleagues’ decision to vacate Bahlul’s conviction in fact contradicts, rather *36 than hews to, this approach. If they wanted to be faithful to Sharif's disposition in the criminal context, they could have resolved Bahlul's Article III claim de novo under the "error” prong of the plain-error standard but then affirmed his conviction because the error was not "plain.” See infra p. 42.

. Even if my colleagues were correct, that Sharif’s discussion of "waiver” refers to for-feilure, they could not reconcile the Court’s repeated admonitions that structural Article III challenges can, in fact, be waived. See, e.g., Sharif, 135 S.Ct. at 1947 n. 11 ("[T]he proposition that legal defenses based upon doctrines central to the courts' structural independence can never be waived simply does not accord with our cases.” (quoting Plant, 514 U.S. at 231, 115 S.Ct. 1447 (emphasis added) (alteration in original))); id. at 12-13, *37 135 S.Ct. 1932 ("[Ajllowing bankruptcy litigants to waive the right to Article III adjudication of Stem claims does not usurp the constitutional prerogatives of Article III courts.” (emphasis added)); id. at 17, 135 S.Ct. 1932 (distinguishing Stem — a structural Article III precedent — on basis that “[tjhe Court has never ... h[e]ld that a litigant who has the right to an Article III court may not waive that right through his consent.”).

. The majority in Nguyen did not reach the Article III question because it decided the case on an alternate statutory ground. See 539 U.S. at 81, 123 S.Ct. 2130.

. None of this analysis — contrary to my colleagues' contention, Maj. Op. 6-7 — turns on the applicability of Fed.R.Crim.P. 52(b). The en banc court imported the plain-error standard into enemy combatant cases "whether or not Rule 52(b) directly governs.” Bahlul, 767 F.3d at 9 n. 4 (citing Salazar, 602 F.3d at 437). The plain-error standard strikes a delicate "balance” that is irrevocably "skew[ed]” whenever courts exempt litigants from its requirements. Salazar, 602 F.3d at 440. The Supreme Court’s decisions to this effect bind us no matter the doctrinal source of the plain-error standard. See Olano, 507 U.S. at 731, 113 S.Ct. 1770 (noting that Rule 52(b) is merely “a restatement of existing law” (quoting Fed.R.Crim.P. 52(b), advisory committee's note (1944))).
To the extent it makes a difference, the plain-error standard does have a statutory basis in enemy combatant cases. The 2009 MCA provides that "[a] finding or sentence of a military commission ... may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused.” 10 U.S.C. § 950a(a). The Congress took this language from the review provision in the Uniform Code of Military Justice (UCMJ). See id. § 859(a); see also id. § 948b(c) ("[t]he procedures for military commissions ... are based upon the procedures for trial by general courts-martial under ... the [UCMJ]”). The U.S. Court of Appeals for the Armed Forces (CAAF) has long read the UCMJ’s review provision to incorporate a plain-error standard that is identical, in all material respects, to Rule 52(b). See United States v. Tunstall, 72 M.J. 191, 197 n. 7 (C.A.A.F.2013); see also id. at 196 ("To establish plain error, an appellant has the burden to demonstrate: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused.”). Given the CAAF’s interpretive gloss on the UCMJ and the Congress’s use of identical language in the 2009 MCA, the plain-error standard applies with the same statutory force here. See 10 U.S.C. § 948b(c) ("judicial construction and application” of UCMJ is "instructive” in interpreting 2009 MCA); Sekhar v. United States, - U.S. -, 133 S.Ct. 2720, 2724, 186 L.Ed.2d 794 (2013) (“[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.”); Bragdon v. Abbott, 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well.”). The sources cited by my colleagues, Maj. Op. 6-7, are inapposite because they deal with review by the Service Courts of Criminal Appeals (CCAs) and CMCR, rather than the "much more limited” review of the^ CAAF and this Court. United States v. Claxton, 32 M.J. 159, 162 (CMA 1991); see also United States v. Powell, 49 M.J. 460, 463 (CAAF 1998) (“[CCAs] enjoy much broader appellate authority than civilian intermediate courts or our Court.”); United States v. Riley, 47 M.J. 276, 281 (CAAF 1997) (Gierke, J„ concurring) (whereas "a [CCA] may take notice of errors of law, whether or not they were preserved by timely objection[, the CAAF] is constrained by the rules of waiver and the doctrine of plain error”). Indeed, the CAAF applies plain error even when the CCA reviewed a forfeited issue de novo. See, e.g., Riley, 47 M.J. at 279-80 (majority op.); United States v. Goings, 72 M.J. 202, 203-04 (CAAF 2013); Tunstall, 72 M.J. at 193-96; United States v. Sweeney, 70 M.J. 296, 300 n. 8, 304 (CAAF 2011).

. See Bahlul, 767 F.3d at 6 ("In 2003, the President designated Bahlul eligible for trial by military commission and in 2004 military *43 prosecutors charged him with conspiracy to commit war crimes.”).

. In Hamdan, the plurality flipped Quirin's "clear conviction” language, stating "[w]hen ... neither the elements of the offense nor the range of permissible punishments is defined by statute or treaty, the precedent must be plain and unambiguous” because "[t]o demand any less would be to risk concentrating in military hands a degree of adjudicative and punitive power in excess of that contemplated either by statute or by the Constitution.” Hamdan, 548 U.S. at 602, 126 S.Ct. 2749 (plurality). Justice Thomas, in dissent, correctly pointed out that "[t]his is a pure contrivance, and a bad one at that. It is contrary to the [clear conviction] presumption we acknowledged in Quirin.” Id. at 690, 126 S.Ct. 2749 (Thomas, J., dissenting). In any event, the Quirin presumption, even by the Hamdan plurality's lights, applies here because Bah-lul’s offense is "defined by statute” — -namely, the 2006 MCA. See id. at 602, 126 S.Ct. 2749 (plurality).

. The other two sources included Article 19 of the Tenth Hague Convention, which mandated that commanding officers of bombarding naval vessels must adhere to the principles of the Tenth Hague Convention, Yamashita, 327 U.S. at 15, 66 S.Ct. 340 (quoting 36 Stat. 2389), and Article 26 of the Geneva Red Cross Convention of 1929, which included- rules related to wounded and sick in armies and made it the commander’s duty to provide “details of execution of” his duties under that Convention. Id. at 15-16, 66 S.Ct. 340 (quoting 47 Stat. 2074, 2092).

. Contrary to my colleagues’ suggestion, I do not rely on Yamashita as precedent that speaks directly to “the type of deference owed to Congress.” Maj. Op. 17. Rather, in Ya-mashita, as in Quinn and Hamdan, the Court noted that the Congress did not “itself undertake! ] to ... define” the law of war. See infra p. 50. It is wrong, however, to suggest that Yamashita does not bear on the proper interpretation of the Define and Punish Clause. Far from it. Yamashita demonstrates that the Supreme Court, implicitly rejecting the rigid international-law veto my colleagues rely upon to vacate Bahlul’s conviction, recognizes that military commissions may constitutionally try offenses that, like inchoate conspiracy, reflect broad international norms. My colleagues make no attempt to meet Yamashita on its terms and, given Ya-mashita ’s significance, the silence is deafening.

. Bahlul was also convicted of material support and solicitation, which convictions were earlier vacated by the en banc court. See Bahlul, 767 F.3d at 5, 29, 31.

. My colleagues fault my reliance on Madsen because "that case involved a military government commission, not a law of war military commission.” Maj. Op. 19. But Madsen’s reliance on Yamashita, in which case the Supreme Court expressly decided a law-of-war military commission had jurisdiction over a law-of-war offense, makes plain that Mad-sen ’s discussion of "the history of United States military commissions” encompasses Bahlul’s military .commission. See Madsen, 343 U.S. at 346, 72 S.Ct. 699.

. The charges against Bahlul, on which he was convicted, alleged that he:
a.traveled to Afghanistan with the purpose and intent of joining al Qaeda;
b. met with Saif al ‘Adi, the head of the al Qaeda Security Committee, as a step toward joining the al Qaeda organization;
c. underwent military-type training at an al Qaeda sponsored training camp then located in Afghanistan near Mes Aynak;
d. pledged fealty, or "bayat,” to the leader of al Qaeda, Usama bin Laden, joined al Qaeda, and provided personal services in support of al Qaeda;
e. prepared and assisted in the preparation of various propaganda products, including the video "The Destruction of the American Destroyer U.S:S. Cole,” to solicit material support for al Qaeda, to recruit and indoctrinate personnel to the organization and objectives of al *49 Qaeda, and to solicit, incite and advise persons to commit Terrorism;
f. acted as personal secretary and media secretary of Usama bin Laden in support of al Qaeda;
g. arranged for Muhammed Atta, also known as Abu Abdul Rahman al Masri, and Ziad al Jarrah, also known as Abu al Qa'qa al Lubnani, to pledge fealty, or "bayat,” to Usama bin Laden;
h. prepared the propaganda declarations styled as martyr wills of Muhammed Atta and Ziad al Jarrah in preparation for the acts of terrorism perpetrated by the said Muhammed Atta, Ziad al Jar-rah and others at various locations in the United States on September 11,-2001;
i. , at the direction of Usama bin Laden, researched the economic effect of the September 11, 2001 attacks on the United States, and provided the result of that research to Usama bin Laden;
j. operated and maintained data processing equipment and media communications equipment for the benefit of Usa-ma bin Laden and other members of the al Qaeda leadership.
Charge Sheet 2-3; Findings Worksheet 3-4.

. Unlike my colleagues, see Maj. Op. 15, 16-17, I do not find the dicta from United States v. Furlong, 18 U.S. 184, 5 Wheat. 184, 5 L.Ed. 64 (1820), or United States v. Arjona, 120 U.S. 479, 7 S.Ct. 628, 30 L.Ed. 728 (1887), on point. Furlong merely held that the Congress could not declare "murder to be piracy " because "there exist well-known distinctions between the crimes of piracy and murder” and "[tjhese are things so essentially different in their nature[] that not even the omnipotence of legislative power can confound or identify them.” 18 U.S. at 196, 198. The same bright line cannot be drawn here because, unlike piracy — "a crime of a settled and determinate nature” — "[o]ffences ... against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined.” Smith, 18 U.S. at 159, 161. Arjona, moreover, stands only for the proposition that a statute need not include the phrase “offense against the law of nations” to be a valid exercise of the Congress’s Define and Punish Clause power. 120 U.S. at 488, 7 S.Ct. 628. It says nothing about the deference we owe the Congress when it exercises that power. Cf. Boos, 485 U.S. at 329, 108 S.Ct. 1157 (deferring to "congressional judgment in this delicate area”); Ware v. Hylton, 3 U.S. 199, 224, 3 Dali. 199, 1 L.Ed. 568 (1796) (opinion of Chase, J.) ("If the right is conceded to be in Congress, it necessarily follows, that she is the judge of the exercise of the right, as to the extent, mode, and manner.”).

. See, e.g., H.R.Rep. No. 109-664, pt. 1, at 24 (2006) ("The offenses defined here ... reflect the codification of the law of war into the United States Code pursuant to Congress's constitutional authority to ‘Define and Punish * * * Offences against the Law of Nations.’ ”); id., pt. 2, at 15 ("[T]he Committee finds the authority for this legislation in article 1, section 8 of the Constitution, including clauses 10 [the Define and Punish Clause], 11, 14 and 18.”); S. 3930, 109th Cong. § 102 (2006) (“Congress makes the following findings: (1) The Constitution of the United States grants to Congress the power ‘To define and punish ... Offenses against the Law of Nations’, as well as the power 'To declare War ... To raise and support Armies ... and To provide and maintain a Navy’.... It is in the national interest for Congress to exercise its authority under the Constitution to enact legislation authorizing and regulating the use of military commissions to try and punish violations of the law of war.”).

. My colleagues’ reliance on Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960), and Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality), suffers from the same deficiency as Bahlul's reliance on Toth. The only difference is that in Singleton and Reid, the subjects of the attempted courts martial were the civilian spouses of service members, not ex-servicemen. See Singleton, 361 U.S. at 235, 80 S.Ct. 297; Reid, 354 U.S. at 3, 77 S.Ct. 1222.

. See, e.g., Hamdan, 548 U.S. at 591, 126 S.Ct. 2749 (listing broader war powers); Hamdi, 542 U.S. at 518, 124 S.Ct. 2633 (plurality) ("The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by 'universal agreement and practice,' are ‘important incident[s] of war.’ " (quoting Quinn, 317 U.S. at 28, 30, 63 S.Ct. 2)); accord id. at 579, 124 S.Ct. 2633 (Thomas, J., dissenting) ("The Executive Branch, acting pursuant to the powers vested in the President by the Constitution and with explicit congressional approval, has determined that Yaser Hamdi is an enemy combatant and should be detained. This detention falls squarely within the Federal Government’s war powers, and we lack the expertise and capacity to second-guess that decision.”); Rasul v. Bush, 542 U.S. 466, 487, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004) (Kennedy, J., concurring in judgment) ("The decision in Eisentrager indicates that there is a realm of political authority over military affairs where the judicial power may not enter. The existence of this realm acknowledges the power of the President as Commander in Chief, and the joint role of the President and the Congress, in the conduct of military affairs.”).

. Winthrop, supra, at 839-40:
[B]reaches of the law of non-intercourse with the enemy, such as running or attempting to run a blockade; unauthorized contracting, trading or dealing with, enemies, or furnishing them with money, arms, provisions, medicines, & c.; conveying to or from them dispatches, letters, or other communications, passing the lines for any purpose without a permit, or coming back after being sent through the lines and ordered not to return; aiding the enemy by harboring his spies, emissaries, & c.; assisting his people or friends to cross the lines into his country, acting as guide to his troops; aiding the escape of his soldiers held as prisoners of war, secretly recruiting for his army, negotiating and circulating his currency or securities — as counterfeit notes or bonds in the late war, hostile or disloyal acts, or publications or declarations calculated to excite opposition to the federal government or sympathy with the enemy, & c.; engaging in illegal warfare as a guerilla, or by the deliberate burning, or other destruction of boats, trains, bridges, buildings, & c.; acting as a spy, taking life or obtaining any advantage by means of treachery; abuse or violation of a flag of truce; violation of a parole or of an oath of allegiance or amnesty; breach of bond given for loyal behavior, good conduct, & c.; resistance to the constituted military authority, bribing or attempting to bribe officers or soldiers or the constituted civil officials; kidnapping or returning persons to slavery in disregard of the President's proclamation of freedom to the slaves, of January 1, 1863.
Elsewhere, Winthrop included conspiracy among these offenses. See id. at 842 (“[c]on-spiracy” is “both a crime against society and a violation of the laws of war”); William Winthrop, A Digest of Opinions of the Judge Advocate General of the Army 328-29 (1880) (“[cjonspiracy by two or more to violate the laws of war by destroying life or property in aid of the enemy” is an "offence[] against the laws and usages of war”).

. My colleagues object to my reliance on Milligan, having been decided after the military-commission trial of the Lincoln conspirators. See Maj. Op. 12. Three Lincoln con *61 spirators petitioned for a writ of habeas corpus in 1868, however, relying on Milligan to argue that "military tribunals have no authority to try civil offenses in districts where the regularly organized civil courts of the country are in undisturbed possession of all their powers.” Ex parte Mudd, 17 F. Cas. 954, 954 (S.D.Fla.1868). The district court dismissed the petition, Milligan notwithstanding. . See id. ("I do not think that ex parte Milligan is a case in point here.”). Regardless whether the courts were open, the conspirators’ offense "transgressed the laws of war” and, thus, "the proper tribunal for the trial of those engaged in it was a military one.” Id.; see also id. (describing “charge on which” Lincoln conspirators were convicted as "conspiracy to - commit the military crime which one of their number did commit and some of them ... more or less” participated in).

. See United States Army Forces, Pacific, Regulations Governing the Trial of War Criminals (Sept. 24, 1945) (making "participation in a common plan or conspiracy” punishable by military commission in Pacific Theater of Operations during World War II); United States Army Forces, China, Regulations Governing the Trial of War Criminals (Jan. 21, 1946) (same for China theater of operations).

. See U.N. Command, Rules of Criminal Procedure for Military Commissions of the United Nations Command at Rule 4 (Oct. 22, 1950) (making "all attempts to commit, or conspiracies and agreements to commit, as well as inciting, encouraging, aiding, abetting, or permitting violations of the laws and customs of war” committed during Korean War punishable by U.N. military commission); Gen. Douglas MacArthur, Letter Order, Gen. HQ, U.N. Command, Tokyo, Japan, Trial of Accused War Criminals (Oct. 28, 1950) (adopting Rule 4).

. The 2009 MCA, Pub.L. No. 111-84, 123 Stat. 2190, was enacted in October 2009, after Bahlul’s military-commission trial but before his appeal to the CMCR. See United States v. Bahlul, 820 F.Supp.2d 1141, 1156—57 (USCMCR 2011).

.See, e.g., 152 Cong. Rec. S10243 (Sept. 27, 2006) (statement of Sen. Frist); id. (statement of Sen. Warner); 152 Cong. Rec. H7522 (Sept. 27, 2006) (statement of Rep. Hunter); 152 Cong. Rec. H7925 (Sept. 28, 2006) (statement of Rep. Hunter); 152 Cong. Rec. S10354 (Sept. 28, 2006) (statement of Sen. Bond); id. (statement of Sen. McConnell); id. (statement of Sen. Frist).

. See, e.g., 152 Cong. Rec. H7522 (Sept. 27, 2006) (statement of Rep. Hunter); id. (statement of Rep. Sensenbrenner); id. (statement of Rep. Cardin); 152 Cong. Rec. H7925 (Sept. 28, 2006) (statement of Rep. Hunter); 152 Cong. Rec. H7925 (Sept. 28, 2006) (statement of Rep. Sensenbrenner).

. See, e.g., 152 Cong. Rec. S10243 (Sept. 27, 2006) (statement of Sen. Graham); id. (statement of Sen. Kyi); 152 Cong. Rec. S10354 *68 (Sept. 28, 2006) (statement of Sen. Graham); id. (statement of Sen. Cornyn); id. (statement of Sen. Sessions).

. See 10 U.S.C. § 948b(d)(l)(A) (2006) (making “speedy trial” rules inapplicable in military commissions). See generally Scott L. Silliman, Prosecuting Alleged Terrorists by Military Commission: A Prudent Option, 42 Case W. Res. J. Int’l L. 289, 294 (2009).

. See, e.g., 152 Cong. Rec. S10243 (Sept. 27, 2006) (statement of Sen. Graham); 152 Cong. Rec. H7522 (Sept. 27, 2006) (statement of Rep. Hunter); 152 Cong. Rec. H7925 (Sept. 28, 2006) (statement of Rep. Hunter).

.See, e.g., 155 Cong. Rec. S5589 (May 19, 2009) (statement of Sen. McConnell); id. (statement of Sen. Johanns); id. (statement of Sen. Martinez); 155 Cong. Rec. S5650 (May 20, 2009) (statement of Sen. Thune); 155 Cong. Rec. S7509 (Jul. 15, 2009) (statement of Sen. Inhofe).

. Notably, the Hamdan Court cited only the Judicial Power Clause, not the Criminal Jury Clause, as a limitation on the Congress’s authority to employ military commissions. See 548 U.S. at 591, 126 S.Ct. 2749.